Hillsborough
No. 6571

STATE OF NEW HAMPSHIRE

v.

JAAN KARL LAAMAN, a.k.a.
KARL J. LAAMAN

December 31, 1974

*Warren B. Rudman,* attorney general, and *Robert V. Johnson II,* assistant attorney general (*Mr. Johnson* orally), for the State.

*William H. Kelley,* by brief and orally, for the defendant.

LAMPRON, J. Defendant was indicted for unlawfully transporting a high explosive on February 16, 1972, contrary to the provisions of RSA ch. 158 (Supp. 1973), and for willfully causing damage to the Manchester police station and to the central fire station by discharging explosives in violation of RSA 572:3. After a trial by jury, the defendant was found guilty of these charges. The indictment charging unlawful transportation has been nol-prossed since and is not involved in this appeal.

Prior to the trial date of June 5, 1972, the defendant's motions to quash the indictments and to dismiss due to extensive preindictment and pretrial publicity; for a continuance for the same reason and to provide adequate time for trial preparation; and for a change of venue or a change of veniremen due to pretrial publicity, were all denied. His motion to suppress certain statements made by him to the police was also denied. A motion to suppress certain personal articles seized by the police was granted. During the trial, defendant's renewed motions to quash the indictments and to dismiss were denied. Defendant excepted to the court's rulings on the admission and exclusion of evidence and to the denial of his motion to set aside the verdicts of guilty. His exceptions to all adverse rulings by the Trial Court *(Dunfey,* J.) were reserved and transferred.

At approximately 1:20 a.m. on February 16, 1972, an explosion occurred immediately outside the Manchester police station. About twenty minutes later a second explosion took place at the same location. One minute later a third explosion damaged the central fire station. Later that same morning a fourth unexploded bomb was discovered lodged on the outside window sill of the office of the chief of police. The three explosions inflicted substantial damages to both of these buildings.

After the first explosion two individuals, one wearing a tan raincoat, were observed running from the scene. A police

officer on duty on Elm Street received a radio report of these events from the police station. Shortly thereafter he saw a man wearing a tan raincoat with his right hand in its pocket which was covered with blood. The officer asked him what happened and received the following response: "He said that while getting into his car he tripped and he cut his hand on a beer bottle." Another officer was summoned and the defendant was placed under arrest and taken to the police station for investigation. Meanwhile a police lieutenant examining the result of the first explosion had discovered an unexploded bomb in a bag on the sidewalk near the station. When defendant arrived at the station in the custody of these officers, the lieutenant testified that he gave the defendant the required "Miranda" warnings and told him about his discovery. "I told him that people might get hurt and asked him did he know how long it would be before that bomb went off." The defendant told me "in less than fifteen minutes." The above were the statements involved in defendant's motion to suppress.

A probable cause hearing on the charges against the defendant was held in the Manchester District Court on February 25, 1972, and cause found. Indictments were returned by the grand jury at the April 1972 term of the superior court. Defendant's pretrial motions were heard on June 6, 1972. The selection of the jury with voir dire occurred on June 7 and 8 and was followed by the trial at which the defendant was found guilty. The main issues on this appeal are the propriety of (1) the denial of various motions of the defendant based on prejudicial media publicity, and (2) the denial of his motion to suppress the statements he made to the police officer before his arrest and thereafter to the lieutenant at the police station.

Regarding the first issue, defendant states in his brief that almost immediately after the release by the police regarding his arrest, he "became the subject of continuous and widespread coverage by all factions of the news media, most notably, at least in terms of characterization, by the 'Manchester Union Leader'. This coverage continued increasingly up to and during . . . [his] trial. In terms of the extent of coverage, it is noted by way of example that local radio station WGIR

in Manchester, New Hampshire, between February 16, 1972, the date of . . . arrest, and June 12, 1972, the date of verdicts, . . . aired forty-five (45) different news releases relating to . . . his alleged criminal activities."

It is well established that due process requires that an accused must receive a trial by a fair and impartial jury. N.H. Const. pt. I, art. 15; U.S. Const. amends. VI, XIV; *State v. Jackson,* 69 N.H. 511, 512, 43 A. 749, 750 (1898); *State v. Booton,* 114 N.H. 750, 329 A.2d 376 (1974); *Sheppard v. Maxwell,* 384 U.S. 333, 353 (1966). Publicity about a case can result in two types of prejudice with regard to the accused's right to a fair trial. The first is inherent prejudice which exists when the publicity by its nature has so tainted the trial atmosphere that it will necessarily result in lack of due process. In such cases the defendant need not show actual identifiable prejudice. *Sheppard v. Maxwell supra; Rideau v. Louisiana,* 373 U.S. 723 (1963); *Calley v. Calloway,* 43 U.S.L.W. 2158 (D. Ga. 1974); *see Estes v. Texas,* 381 U.S. 532, 542-43 (1965). The second is actual prejudice which exists when the publicity has infected the jurors to such an extent that the defendant cannot or has not received a fair and impartial jury trial. In this situation the defendant must show that the nature of the opinions formed by the jurors as a result of the publicity are such that they cannot be set aside by the jurors to enable them to render a verdict based on the evidence presented in court. *Irvin v. Dowd,* 366 U.S. 717, 723 (1961); *Ignacio v. Guam,* 413 F.2d 513, 518 (9th Cir. 1969); *State v. Schmid,* 109 Ariz. 349, 353, 509 P.2d 619, 623 (1973); *State v. Nelson,* 103 N.H. 478, 483-84, 175 A.2d 814, 819-20 (1961).

The exhibits introduced by the defendant pertaining to publicity about this case were issues of the *Manchester Union Leader* published on the following dates: February 16, 17, 25, 26, 29, March 2, June 5, 6, 7, 12, 13, 1972. There were two issues of the *New Hampshire Sunday News* published March 26 and June 4, 1972. The articles published in February and March dealt with the details of the bombings, comments on these happenings, and information about the defendant's background including photographs and prior criminal activities. The June publications dealt primarily with the

motions to suppress filed by the defendant, also with a hearing on a motion for a separate trial filed by an alleged accomplice of the defendant, and with the different phases of the trial, the verdicts, and sentencing.

The above contrasts significantly with the cases where inherent prejudice has been ruled to exist. In *Sheppard v. Maxwell,* 384 U.S. 333, 335 (1966), there were 5 volumes of clippings from newspapers which had been published from the date of the murder on July 4, 1954, to and during the trial which began in December 1954. It was held that the failure of the trial court to protect the defendant from this "massive, pervasive and prejudicial publicity" prevented him from receiving a fair trial consistent with due process. In *Rideau v. Louisiana,* 373 U.S. 723 (1963), a motion picture with a sound track of an "interview" of Rideau by the sheriff which lasted about 20 minutes was shown three times on television to audiences of 24,000, 53,000 and 20,000 persons in the county where defendant was later tried. It showed "Rideau, in jail, flanked by the sheriff and two State troopers, admitting in detail the commission of the robbery, kidnaping, and murder, in response to leading questions from the sheriff." 373 U.S. at 725. The Court ruled that a trial thereafter would be a "hollow formality". *Id.* at 726. In *Calley v. Calloway,* 43 U.S.L.W. 2158 (D. Ga. 1974) the court stated: "Never in the history of the military justice system, and perhaps in the history of American Courts, has any accused ever encountered such intense and continuous prejudicial publicity as did the . . . [accused]. This intensive publicity took virtually every imaginable form and was sustained throughout the trial." We rule that the publicity in the present case did not create an inherent prejudice which prevented the defendant from receiving a fair and impartial jury trial.

Absent publicity which results in inherent prejudice, the defendant must prove that the publicity complained of resulted in actual identifiable prejudice which prevented him from obtaining a fair trial. *Irvin v. Dowd,* 366 U.S. 717, 722 (1961); *Mikus v. United States,* 433 F.2d 719, 723 (2d Cir. 1970). It is not enough to allege adverse publicity without a showing that as a result thereof the jury was not free from the dominant influence of knowledge acquired outside the

courtroom thus creating a reasonable likelihood that a fair trial was not had. *Ignacio v. Guam,* 413 F.2d 513, 518 (9th Cir. 1969); *Bearden v. United States,* 403 F.2d 782, 785 (5th Cir. 1968).

To be an indifferent juror, under RSA 500-A:22 (Supp. 1973), it is not required, however, that the juror "be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity and scarcely any of those best qualified to serve as jurors will not have formed some impression as to the merits of the case. This is particularly true in criminal·cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 722-23 (1961); *State v. Sawtelle,* 66 N.H. 488, 538, 32 A. 831, 851-52 (1891); *People v. Medina,* 521 P.2d 1257 (Colo. 1974).

Whether or not a prospective juror is indifferent, for whatever reason his impartiality is questioned, is a determination to be made in the first instance by the trial court on voir dire. *State v. Comery,* 78 N.H. 6, 11-12, 95 A. 670, 673-74 (1915); *State v. Rheaume,* 80 N.H. 319, 320, 116 A. 758, 760 (1922). It is then the duty of this court on appeal to evaluate the voir dire testimony of the empaneled jury to determine whether an impartial jury was selected. *United States v. McNally,* 485 F.2d 398, 403 (8th Cir. 1973); *State v. Northup,* 318 A.2d 489, 491-92 (Me. 1974); *see Voir Dire - Safeguard Against Jury Bias,* 57 J. Am. Jud. Soc'y 386 (1974).

We have reviewed the 240-page transcript of the voir dire conducted by the trial court. At the outset, some prospective jurors were excused because of age, physical infirmity, or other reasons not related to publicity. Thirty-one other prospective jurors were examined on matters specifically related to the issues in this case. Each of them was asked by the trial court a wide range of questions designed to test his

prior knowledge of the case through publicity or otherwise; whether he held or had expressed an opinion on the guilt or innocence of the defendant; whether he would return a verdict solely on the evidence presented in court; whether he had a preconceived attitude toward long-haired individuals or anti-war demonstrators; and whether he was a member of war veterans organizations.

Of the twelve jurors who rendered the verdicts in this case, three had read no newspaper accounts of this case; two read news items in out-of-town newspapers; one read only headlines; one scanned the news items. Of the remaining five jurors, each read accounts published either at the time of the incident or immediately prior to the trial, or both. However, all twelve jurors stated under oath that they had no preconceptions, or had formed no opinion; or had not been influenced; or had not had their judgment affected; and would render a verdict in accordance with the evidence presented in court. Only one of them was a regular subscriber to the *Manchester Union Leader*. One juror had seen defendant's photograph. Only one of them had any knowledge of the defendant's background, which consisted only of where defendant had lived and attended school.

Five of the above jurors had been found unacceptable by the defendant but were seated over his objections. The grounds of objections were the following: (1) juror hesitant in answering questions regarding peaceful demonstrations and read the *Manchester Union Leader*; (2) juror read the *Union Leader* and thought "Angela Davis" guilty prior to trial; (3) juror was aware of a codefendant; (4) juror stated that probably an individual would lie under oath if he had not been properly instructed; (5) juror, a regular reader of the *Union Leader*, stated a person could lie even though under oath.

The record of the voir dire shows that the trial court acted carefully and competently to insure that no biased juror was empaneled. The members of the jury on their own statements met the standards established for a fair and impartial jury. On the record before us we hold that the defendant received a fair and impartial jury trial consonant with the requirements of due process. We further hold that the trial court did not abuse its discretion in denying the defendant's motions for

a change of venue, a change of veniremen, a continuance, and to quash the indictments and to dismiss, all based on prejudicial adverse publicity. *State v. Sawtelle,* 66 N.H. 488, 32 A. 831 (1891); *State v. Nelson,* 103 N.H. 478, 175 A.2d 814 (1961); *State v. Northup,* 318 A.2d 489 (Me. 1974); *see* ABA Project on Minimum Standards For Criminal Justice, Fair Trial and Free Press § 3.6 (1968). Denial of defendant's motion for a continuance to provide adequate time for trial preparation was a proper exercise of the court's discretion as the record reveals no resulting prejudice to the defendant from its denial. *State v. Sargent,* 104 N.H. 211, 213, 182 A.2d 607, 609 (1962); *United States v. Schembari,* 484 F.2d 931, 934 (4th Cir. 1973); *People v. Wright,* 14 Ill. App. 3d 88, 302 N.E.2d 146 (1973).

We cannot agree with defendant's claim that the statement elicited from him in his encounter with the patrolman on Elm Street at 1:30 a.m. on the morning of the bombings was the product of a custodial investigation for which *Miranda* warnings *(Miranda v. Arizona,* 384 U.S. 436, 444 (1966)) were required to be given. *State v. Mitchell,* 113 N.H. 542, 543, 311 A.2d 134, 135 (1973); *State v. Scanlon,* 110 N.H. 179, 181, 263 A.2d 669, 670 (1970); *State v. Desjardins,* 110 N.H. 511, 514, 272 A.2d 599, 602 (1970). Although the patrolman's suspicions were necessarily aroused, his inquiry "what happened", when he saw defendant with his hand in his coat pocket covered with blood, cannot, under any reasonable application of the constitutional rule laid down in *Miranda,* be said to bear any of the hallmarks of inherently coercive police practices calculated to produce an involuntary admission. The exchange between the officer and the defendant took place before he was taken in custody. His statement was freely and voluntarily made and was admissible. The trial court properly denied defendant's motion to suppress.

Finally we consider the statement made by the defendant in answer to a question from a police lieutenant when defendant arrived at the station in the custody of the arresting officers. There was evidence that the lieutenant advised the defendant of his *Miranda* rights. Having found an unexploded bomb on the sidewalk, the lieutenant then asked the defendant what time the next bomb outside the police station

was going off. Defendant hesitated a few seconds and then answered, "less than fifteen minutes". The evidence at the hearing on defendant's motion to suppress warranted the court's finding that defendant's physical condition at that time was not such as to impair his mental faculties. The trial court could properly find and rule on the evidence that defendant's statement was voluntary and a waiver of his *Miranda* rights. *State v. Geldart,* 111 N.H. 219, 220, 279 A.2d 588, 589 (1971); *People v. Johnson,* 55 Ill. 2d 62, 70-71, 302 N.E.2d 20, 25 (1973); *Mitchell v. United States,* 434 F.2d 483, 487 (D.C. Cir. 1970); *see Michigan v. Tucker,* 417 U.S. 433 (1974); 88 Harv. L. Rev. 41, 197 (1974).

*Exceptions overruled.*

All concurred.