Merrimack
No. 79-049

## THE STATE OF NEW HAMPSHIRE

v.

## VIKTOR NOVOSEL

March 13, 1980

*Thomas D. Rath*, attorney general (*Peter W. Heed*, assistant attorney general, orally), for the State.

*James E. Duggan*, and *Schuyler Crawford*, of Concord (*Mr. Duggan* orally), for the defendant.

KING, J. This is an appeal from a conviction for second-degree murder following a bifurcated trial. The defendant, Viktor Novosel, was sentenced to forty years to life. This is the fourth time the defendant has been before this court. *State v. Gregoire*, 118 N.H. 140, 384 A.2d 132 (1978); *Novosel v. Helgemoe*, 118 N.H. 115, 384 A.2d 124 (1978); *State v. Novosel*, 115 N.H. 302, 339 A.2d 16 (1975).

On December 24, 1974, the defendant went to the home of George and Helen Morrison in search of his former wife and his children. Novosel carried a loaded gun. Precisely what happened thereafter is unclear.

George Morrison testified that when Novosel entered the living room with gun in hand, he demanded to know where his former wife and his children were. In response, George Morrison leaned over to pick up a coffee table to throw at Novosel. According to Morrison, Novosel then fired at him, striking him in the chest but causing only a superficial wound. George Morrison then fled to a neighbor's house to call the police. Helen was still alive when George fled but was dead from a bullet wound when he returned.

Novosel testified that he entered the Morrison house that night through an unlocked back door. He entered the living room where, before any conversation ensued, George Morrison tried to grab

him. Novosel pushed him away, but Morrison came after him again. Novosel then took out the gun and fired at the floor. Novosel denied shooting directly at Morrison. As Novosel and Morrison struggled, Helen Morrison got up and started walking from the room. Novosel walked after her asking for his former wife and his children. George Morrison grabbed Novosel from behind, the gun went off and Helen Morrison fell to the floor. Novosel immediately fled the scene and was arrested within a few hours.

After a probable cause hearing on January 9, 1975, the defendant was indicted for second-degree murder, aggravated assault and possession of a handgun by a convicted felon. Novosel, however, was not tried on these charges. Instead, the State indicated at a pre-trial conference on April 11, 1975, that it intended to invoke the provisions of RSA 651:8, *i.e.*, to resubmit the case to the grand jury for a determination as to whether it would "omit to find an indictment . . . for the reason of insanity or mental derangement. . . ." RSA 651:8.

Recognizing the constitutional problems presented by RSA 651:8 and :9, the Superior Court (*Keller*, C.J.) reserved and transferred several issues to this court. The defense objected to the transfer on speedy trial grounds on April 15, 1975. On June 5, 1975, in *State v. Novosel supra*, this court held: (1) that RSA 651:8 and :9 were constitutional if the defendant was accorded a hearing consistent with RSA 135:30-a; and (2) that Novosel's request for a bifurcated trial could be honored in the discretion of the trial court.

Novosel was denied a bifurcated trial upon remand, however, because the grand jury which was reconvened by the State failed to return an indictment by reason of insanity. The grand jury certified defendant insane, and the State nolle prossed the indictments. Thus, at the hearing held on June 9, 1975, the only issues decided by the court were whether it would be dangerous for Novosel to go at large and whether his life commitment should be to the State prison or to the State hospital. *See* RSA 651:9 (Supp. 1979).

To prove Novosel dangerous, the State produced expert testimony from two psychiatrists and other testimony concerning the killing of Helen Morrison. A defense psychiatrist, however, sharply disagreed with the diagnosis of the State's experts and concluded that "institutional care" for Novosel was inappropriate. George Morrison and Viktor Novosel testified about the events surrounding Helen Morrison's death.

On June 12, 1975, the court entered an order finding Novosel dangerous and committed him for life to the maximum security unit of the New Hampshire State Hospital. Anticipating this court's decision in *Gibbs v. Helgemoe*, 116 N.H. 825, 367 A.2d 1041 (1976), the court ordered Novosel's commitment reviewed in two years.

Novosel subsequently renewed his challenge to the grand jury procedure, this time by a writ of habeas corpus in the superior court. In the interim, the grand jury procedure had been found to be constitutionally defective on federal grounds. *Kanteles v. Wheelock*, 439 F. Supp. 505 (D. N.H. 1977). This court therefore held in *Novosel v. Helgemoe*, 118 N.H. 115, 384 A.2d 124 (1978) that the grand jury procedure was unconstitutional and ordered Novosel's release unless new indictments were returned against him within thirty days.

Novosel was again indicted for second-degree murder, aggravated assault and possession of a gun by a felon. The gun charge was severed for a separate trial. The murder trial began on May 1, 1978, three-and-a half years after Novosel's arrest. Pre-trial motions to dismiss for lack of speedy trial, violation of double jeopardy and prosecutorial misconduct were denied. A defense motion for a bifurcated trial was granted. At the guilt phase of the trial, the jury found Novosel guilty of second-degree murder and not guilty of aggravated assault.

Prior to the "sanity phase" of the bifurcated trial, the court denied a defense motion to preclude the State from contesting Novosel's insanity defense. In support of the insanity defense, the defendant called two psychiatrists, a psychologist, and former assistant attorney general Robert Johnson, who had prosecuted Novosel in 1975. Johnson denied that he had ever "come to a particular conclusion himself as to whether or not Mr. Novosel was sane or insane." The only evidence offered by the State was testimony by Barbara Freeman, Novosel's girlfriend from August 1974 to the time of trial. In her opinion, Novosel was not insane. In closing argument, the State argued that Novosel was sane. The jury agreed. The Court (*Mullavey*, J.) sentenced Novosel to forty years to life with credit for his incarceration since December 24, 1974.

The first issue is whether due process was violated when, on remand from an appellate court, the prosecution reversed its position regarding the defendant's insanity. The defendant argues

that the prosecution could not, consistent with due process, present his case to the grand jury in 1975 for consideration under RSA 651:8, and then, after a successful challenge to that statute, take the position that the defendant was sane at the time of the commission of the crime. Defendant, however, is not in a position to argue unfairness. All during the time the validity of RSA 651:8 was being litigated, he insisted that he was not insane, yet he thereafter changed his position and claimed he was insane.

The defendant argues that the State's change of position was intended to increase his penalty from a hospital commitment with biennial review to a criminal sentence (forty years to life in prison) and, therefore, constitutes "vindictive" behavior which violates the defendant's right to due process.

■ Because it would be extremely difficult in any given case to prove the actual existence of a retaliatory motivation, *North Carolina v. Pearce*, 395 U.S. 711, 725 n.20 (1969), no vindictive motive on the part of the prosecution need be proved to protect the defendant from an increased penalty for challenging his confinement. *Blackledge v. Perry*, 417 U.S. 21 (1974); *see North Carolina v. Pearce supra.*

■ Prosecutorial "vindictiveness", however, is present only if the prosecution had "upped the ante" during a retrial and if a harsher sentence is thereby imposed. *Blackledge v. Perry supra; North Carolina v. Pearce supra; Green v. United States*, 355 U.S. 184 (1957). *But see State v. Koski*, 120 N.H. 112, 411 A.2d 1122 (1980). This threshold element is not present here. After the 1975 grand jury omitted to indict, and after the defendant was found to be dangerous after hearing, he was committed by the court to an indeterminate term (with a maximum of life) to the New Hampshire hospital or State prison. While the commitment had to be reviewed every two years, there was certainly no guarantee that the defendant would ever be released. This must be contrasted with the defendant's parole eligibility. RSA 651:45-a. Whether incarceration would be longer under the sentence than under the commitment is unascertainable. In addition, while one penalty is a commitment based on a grand jury certification of insanity and a court finding of dangerousness, the second is a sentence based on a guilty verdict after a jury trial. Although both penalties are harsh, one is not conclusively harsher than the other. Because the prosecution cannot be found to have "upped the ante" in this instance, and because one penalty is not

conclusively harsher than the other, the defendant's due process argument fails.

■ The defendant next argues that he was denied his right to a speedy trial by an unjustifiable delay of three-and-one-half years between his arrest and trial. Under both the Federal and State Constitutions, a defendant is entitled to be free from capricious and oppressive delay in receiving a trial. U.S. CONST. amend. VI; N.H. CONST. pt. 1, art. 14; *Barker v. Wingo*, 407 U.S. 514 (1972); *State v. White*, 116 N.H. 687, 366 A.2d 872 (1976).

■■ The period considered in determining the length of delay is between arrest and trial. *United States v. Marion*, 404 U.S. 307 (1971); *State v. Collins*, 115 N.H. 499, 502, 345 A.2d 162, 165 (1975). In the instant case, this period is three-and-one-half years. The length of delay, however, is not determinative of the claim. *Barker v. Wingo supra; State v. Cole*, 118 N.H. 829, 395 A.2d 189 (1978); *State v. White*, 116 N.H. 687, 366 A.2d 872 (1976). Rather, the right pertains to "orderly expedition and not mere speed." *United States v. Ewell*, 383 U.S. 116, 120 (1966); *Smith v. United States*, 360 U.S. 1, 10 (1959); *State v. Coolidge*, 109 N.H. 403, 412, 260 A.2d 547, 554 (1969), *rev'd on other grounds, Coolidge v. New Hampshire*, 403 U.S. 443 (1971). To determine whether the right to a speedy trial has been violated, we must apply the criteria set forth in *Barker v. Wingo supra:* (1) the length of delay; (2) the reasons for the delay; (3) the defendant's responsibility to assert his right; and (4) prejudice to the defendant, to be assessed in light of his right to a speedy trial. *State v. Hudson*, 119 N.H. 963, 409 A.2d 1349 (1979); *State v. Isaac*, 119 N.H. 971, 409 A.2d 1354 (1979); *Barker v. Wingo supra; State v. White supra; see State v. Fraser*, 120 N.H. 117, 411 A.2d 1125 (1980).

The defendant was arrested on December 24, 1974. The constitutionality of RSA 651:8 was tested on an appeal to this court and a decision was rendered on June 5, 1975. By June 9, 1975, (less than six months after the arrest), the State had brought the case to the stage where a hearing was held to determine if the defendant was too dangerous to be at large and whether his commitment should be to the State hospital or to the State prison.

The defendant renewed his challenge to the State grand jury procedure by way of a writ of habeas corpus. This time, RSA 651:8 was found to be unconstitutional. *Novosel v. Helgemoe*, 118 N.H. 115, 384 A.2d 124 (1978). The court ordered Novosel's release,

unless the State sought and obtained new indictments within thirty days. The State did seek such indictments, which were returned by the grand jury within the allotted time. The jury trial began on May 1, 1978.

The defendant argues that the delay between arrest and trial resulted from the State's decision to utilize RSA 651:8. Although this is correct, the delay cannot be attributable to the prosecution. The prosecution chose a statutory procedure which was initially found constitutional by this court. *State v. Novosel supra*. This was not a deliberate attempt to delay the trial, nor was the delay due to negligence.

At the time RSA 651:8 was utilized, and indeed until 1978 when the law was declared unconstitutional, the State was operating through a legitimate process of criminal justice administration. "A disposition of a case, made according to the prevailing proceedings of law free from arbitrary, vexatious, and oppressive delays is considered to be in accordance with such a constitutional requirement." *Riendeau v. Milford Municipal Court*, 104 N.H. 33, 34–35, 177 A.2d 396, 398 (1962). *See also Pollard v. United States*, 352 U.S. 354, 361 (1957); *State v. Dufield*, 119 N.H. 28, 398 A.2d 818 (1979) (Douglas, J., dissenting).

■ Prejudice must also be considered in determining whether the defendant was denied a speedy trial. Although the defendant asserts "some loss of memory" by a witness, the only example cited is a failure of the defendant's own witness to respond to a question asked by the State on cross-examination. The defendant makes no claim that any witnesses involved in the trial died or disappeared. We find no prejudice suffered by defendant under these circumstances.

■ The right to a speedy trial is necessarily relative and must be considered with regard to the practical administration of justice. *State v. Isaac*, 119 N.H. 971, 409 A.2d 1354 (1979); *State v. Dufield*, 119 N.H. 28, 29, 398 A.2d 818, 819 (1979); *State v. Cole*, 118 N.H. 829, 830, 395 A.2d 189, 190 (1978). It is the opinion of this court that the delay occasioned by the many appeals in this case was a valid exercise of criminal justice administration and did not constitute a denial of the defendant's right to a speedy trial.

■ The defendant next argues that he was denied his right to cross-examine and confront the witnesses against him by the trial

court's ruling that the State's key witness need not disclose his address. Generally, a witness must divulge his address on cross-examination. *Smith v. Illinois*, 390 U.S. 129 (1968); *Alford v. United States*, 282 U.S. 687 (1931); *see United States v. Honneus*, 508 F.2d 566, 572 (1st Cir. 1974), *cert. denied*, 421 U.S. 948 (1975). However, "where the government voices a legitimate concern for a witness' safety, the trial court must balance the potential danger to the witness against the need of the defense for the information." *United States v. Cavallaro*, 553 F.2d 300, 304 (2d Cir. 1977). *See also State v. Caldwell*, 303 Minn. 297, 227 N.W.2d 382 (1975).

█ The need for such information is to prevent prejudice which "ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them." *Alford v. United States*, 282 U.S. at 692. The critical question then becomes not simply whether the witness has divulged his home address, but whether or not the defendant has been given sufficient "opportunity to place the witness in his proper setting." *Id.; United States v. Alston*, 460 F.2d 48, 51–52 (5th Cir.), *cert. denied*, 409 U.S. 871 (1972).

█ The defendant was familiar with the witness and his background. Not only was the witness the defendant's father-in-law, but the defendant was convicted of committing a violent crime in the witness' own home. Further, on direct examination, the defendant and jury were told where the witness lived at the time of the offense. *Winkle v. State*, 488 S.W.2d 798 (Tex. 1972). The witness had moved to another state at the time of trial, but the likelihood that a jury would be aided by the knowledge of what state, much less the precise city and street, is tenuous at best. We find that the defendant had a sufficient "opportunity to place the witness in the proper setting." *Alford v. United States, supra* at 692.

█ █ The defendant argues that the witness must demonstrate more than undefined fear before cross-examination regarding the witness' address can be denied. "[W]hile express procedures are obviously desirable, if the reasons are implicit because of the nature of the crime and the posture of the witness, they need not be ignored." *McGrath v. Vinzant*, 528 F.2d 681, 684 (1st Cir.), *cert. dismissed*, 426 U.S. 902 (1976). Indeed, the nature of the crime charged and the fact that the witness claimed to be a

victim of criminal violence make unnecessary any explicit disclosure of the threat of harassment or harm, because the threat is inherent in the situation. *Commonwealth v. McGrath*, 364 Mass. 243, 303 N.E.2d 108 (1973). In the instant case, we find that the danger to the witness outweighed the defendant's need for disclosure, and therefore hold that the trial judge did not abuse his discretion by allowing the witness not to disclose his precise current address.

The defendant next argues that the failure of the trial court to prevent a newspaper photographer from taking pictures of the defendant during the view caused inherent prejudice and denied the defendant a fair trial. In support of his position, the defendant argues that as a result of his own evasive action at the view (when raising a coat over his face when a photographer pointed a camera at him) the jurors might have concluded he had something to hide. Although he admits that he cannot demonstrate actual prejudice, he argues that this evidence is sufficient to support a finding of inherent prejudice.

In order to support a finding of inherent prejudice, the impermissible act by its very nature must have so tainted the trial atmosphere that it will necessarily result in a lack of due process. *State v. Stewart*, 116 N.H. 585, 586–87, 364 A.2d 621, 622 (1976); *see State v. Laaman*, 114 N.H. 794, 798, 331 A.2d 354, 357 (1974), *cert. denied*, 423 U.S. 854 (1975). We find that the court has no authority to restrict media outside the courtroom in this situation. Moreover, we find no prejudice under these circumstances that would constitute a denial of the defendant's due process rights.

The defendant next argues that there was insufficient evidence to support the jury's finding that he was sane at the time of the crime. The question of sanity is one peculiarly for the jury, and the jury's determination in this regard will not be overturned unless a rational trier of fact could not have found as this jury did. *Moore v. Duckworth*, 99 S. Ct. 3088 (1979); *see Jackson v. Virginia*, 99 S. Ct. 2781 (1979); *State v. Kiluk*, 120 N.H. 1, 410 A.2d 648 (1980).

Although only the defendant offered expert testimony in the instant case, the jury is not obliged to believe that testimony, and the absence of expert testimony from the prosecution's case is not fatal. *See Moore v. Duckworth supra*. The defendant's evidence

consisted of testimony from experts who agreed that the defendant was insane, but who could not agree as to the proper diagnosis. This conflicting testimony must be weighed in the first instance against that of the defendant's girlfriend who knew the defendant well and did not believe him to be insane. Other considerations to be factored into the analysis of sanity included evidence showing how the defendant was able to think, plan, and attempt to elude the police. We do not find the jury's determination contrary to what any rational trier of fact could have found, and therefore, the jury's verdict must stand.

The defendant also argues that the trial court's failure to voir dire the jury concerning prejudicial publicity during trial was an abuse of discretion and denied the defendant an impartial jury and fair trial.

In the case at bar, the jury was voir dired and selected on May 1, 1978. Before their release that afternoon, they were admonished twice by the court not to read or listen to any news accounts regarding the trial. When the trial reconvened on the next day, the defendant moved to further examine the jury concerning an article that appeared in the *Concord Monitor* on the afternoon of May 1. The court denied this motion, and the defendant now contends that this ruling was error.

██ ██ Our system of justice is premised upon the belief that jurors will follow the court's instructions. *Delli Paoli v. United States*, 352 U.S. 232, 242 (1957); *Opper v. United States*, 348 U.S. 84, 95 (1954). Whether to further voir dire the jury regarding pre-trial publicity after they had been repeatedly admonished not to listen to or read news accounts of the trial the previous day is within the discretion of the trial court. *Kennedy v. Ricker*, 119 N.H. 827, 409 A.2d 778 (1979). We find no abuse of discretion here and hold that the court's instructions to the jury amply protected the defendant's rights under these circumstances.

*Exceptions overruled; appeal dismissed.*

All concurred.