THE STATE OF NEW HAMPSHIRE

v.

BRUCE WELLMAN

THE STATE OF NEW HAMPSHIRE

v.

BRUCE WELLMAN

July 29, 1986

*Stephen E. Merrill,* attorney general (*Gregory W. Swope,* assistant attorney general, on the brief in No. 84-444, *Barbara Ruth Keshen,* attorney, on the brief in No. 84-548, and *Andrew W. Serell,* attorney, on the supplemental brief), by brief for the State.

*Joanne Green,* assistant appellate defender, of Concord, by briefs for the defendant.

BROCK, J. The defendant, Bruce Wellman, was convicted in separate trials of accomplice to burglary, RSA 628:8, III(a) and RSA 635:1, and receiving stolen property, RSA 637:7, I. Since these consolidated appeals arise out of the same set of factual circumstances, we first describe their substantive and procedural histories in the form of a single narrative, and then proceed to deal separately with the arguments presented by the defendant in each appeal, except for one issue common to both. We affirm the first conviction and reverse the second.

The defendant was initially convicted of being an accomplice to the burglary of Ruth and Willard Staples's home on Moultonville Road in Center Ossipee. On February 11, 1984, Mr. and Mrs. Staples returned to their home at approximately 9:30 p.m. from their place of business, the Abbott and Staples General Store. Upon entering their house, the Stapleses discovered two gloved, ski-masked

men who, after a brief scuffle in which a gun was fired, tied them up and fled in Mr. Staples's Ford. The intruders took money and other valuables with them. The Stapleses freed themselves, and Mr. Staples telephoned the police from a neighbor's house. From that point on, the police received and transmitted numerous pieces of information concerning the crime.

After hearing a report of the burglary on his police scanner, Raymond Merit, the operator of Ryan's Garage in Center Ossipee, telephoned the police to report that two vehicles had stopped in front of his place of business, one a small, light-colored Ford and the other a large, dark-colored automobile with "opera lights" (small white lights on the sides behind the doors). The dark-colored vehicle, a sedan, had left its stopping place, heading south on old Route 16. The Ford had remained in the lot. Merit soon thereafter called the police a second time to report that the sedan had passed his garage again, going in the opposite direction.

Several other area residents also reported seeing a vehicle with opera lights that night. A Mrs. Cullen, who had heard the reports on a police scanner, advised the police that a vehicle with opera lights was heading east on Route 25 at high speed. A member of the West Ossipee Fire Department, Donald Osier, reported that the vehicle was heading east toward Porter Village, Maine. The New Hampshire police provided much of the information which they received to the York County (Maine) Sheriff's Office, including the fact that the crime had taken place, that a large maroon or cranberry-colored vehicle with opera lights was headed east on Route 25 toward the Maine border, and that up to four persons were involved.

At approximately 11:30 p.m., Trooper Arnold of the Maine State Police stopped a vehicle answering the above description on Route 25. Only one person, not four, was in the vehicle. After ordering the driver, Bruce Wellman, out of the car, Arnold noticed two bags on the floor, one partially concealed under the driver's seat. He seized the latter bag, searched it, and discovered a New Hampshire certificate of title, assorted envelopes addressed to the Abbott and Staples Store, money, and checks made out to the Store. Arnold contacted other police officials in order to find out who the victims of the crime were. Upon learning that the Abbott and Staples Store was involved, he placed the defendant under arrest.

The next day, police obtained a warrant to search the vehicle. They discovered a variety of items that had been taken from the Stapleses' home, along with a gun that had been discharged, a ski mask, gloves, walkie-talkies, and a nylon bag. The defendant was extradited to New Hampshire and held in pre-trial confinement.

After a jury trial, Wellman was convicted of being an accomplice to the burglary under a superseding indictment. The Trial Court (*Wyman*, J.) sentenced him to three and one-half to seven years, with 193 days' credit for pre-trial confinement. Wellman was later convicted in a separate trial of receiving stolen property, and was sentenced by the Trial Court (*Dickson*, J.) to five to ten years, with 193 days' credit for pre-trial confinement, concurrent with his prior sentence. The defendant appeals both his convictions on several grounds. We begin with issues arising from the accomplice to burglary conviction.

## I. *Accomplice to Burglary Conviction*

The defendant's first argument on appeal concerns the applicability of the rule of *State v. Hastings*, 120 N.H. 454, 417 A.2d 7 (1980) to the facts of this case. In *Hastings*, we stated: "We can see no reason why an indictment should not be brought within sixty days from the date of an arrest. If it is not, it will be the State's burden to demonstrate that the delay has not been unreasonable." *Id.* at 455–56, 417 A.2d at 8.

In the present case, the defendant was arrested on the night of February 11, 1984. He was initially indicted for accomplice to burglary on April 5, fifty-four days after his arrest and hence within the sixty-day *Hastings* period. This first indictment charged that he

"did with the purpose of promoting and facilitating the commission of the crime of burglary, a class A Felony, and by providing transportation with a motor vehicle to the crime scene at Moultonville Road in Ossipee, New Hampshire, did aid Anthony Persuitti and Joseph Dupaw, who without permission, license, or privilege, purposely entered the dwelling of Willard Staples on Moultonville Road in Ossipee, New Hampshire, an occupied structure which was closed to the public[.]"

However, the indictment failed to allege that Persuitti and Dupaw entered the Stapleses' house with the intent to commit theft therein. *See* RSA 635:1. Thus, the first indictment was defective because it failed to set out one of the necessary elements of the underlying crime of burglary. *Cf. State v. Champagne*, 125 N.H. 648, 484 A.2d 1161 (1984) (an indictment for accomplice to arson is sufficient if it gives defendant enough information to prepare his defense and identifies the elements of the underlying crime).

The defendant was reindicted on May 29, 1984, for the same crime. The only relevant change in the indictment was that the phrase "with the intent to commit the crime of theft therein" was

added to the description of the underlying crime of burglary. This new indictment was returned 108 days after the defendant's arrest.

Wellman argues that the defective first indictment was insufficient to stop the running of the *Hastings* clock. In other words, according to the defendant, the requirement of "timeliness relates to the indictment on which the defendant is actually tried, not merely to any indictment the State may bring." The defendant claims that a rule to the contrary would destroy the efficacy of the *Hastings* principle because the State could charge a defendant by means of a defective indictment within the sixty-day period, enter a *nolle prosequi*, and reindict him or her at a later time. The defendant also maintains that the State has not shown that the delay was reasonable.

We reject the defendant's argument. First, the defendant was adequately on notice that he was charged with accomplice to burglary and of the circumstances from which the charge arose. The indictment by its terms charged him with accomplice to burglary in that it specifically mentioned facilitation of the crime of burglary. It failed, to be sure, to allege the perpetrators' collective state of mind. Nevertheless, the defendant was sufficiently apprised for *Hastings* purposes of what the State was attempting to charge, and was not surprised by the second indictment. Even though the new indictment was returned just before trial, the defendant was notified prior to being placed in jeopardy on the offense. While the hearing on this *Hastings* issue took place after the swearing of the jury, which is the time when jeopardy normally attaches, *see* R. McNA-MARA, 1 New Hampshire Practice, Criminal Practice and Procedure § 497 (1980); *cf. State v. Lister*, 119 N.H. 713, 406 A.2d 967 (1979), the defendant expressly agreed that the hearing could take place at such time and that he waived the issue.

■ Second, the defendant's fear that our decision would render *Hastings* a nullity is unfounded. Where the initial indictment fails to give notice adequately of the charges against a defendant, a case for a more stringent application of the *Hastings* rule may be made. *See State v. Pinder*, 128 N.H. 66, 70, 514 A.2d 1214, 1243–44 (1986) (defective indictment that nevertheless apprises defendant of nature and cause of accusation against him and that worked no surprise satisfies *Hastings*). That, however, is not this case. Since we hold that the first indictment satisfied the principle enunciated in *Hastings*, we do not reach the issue of the reasonableness of the delay.

■ In addition, the defendant argues that his motions for mistrial, which were made on the basis that evidence of prior crimes was erroneously admitted, were improperly denied. This contention

is without merit. The defendant bases his claim of error on the admission of parts of the testimony of two witnesses. The first witness, Blair Clark, an acquaintance of the defendant, testified that he had seen the walkie-talkies found in Wellman's trunk before. He further testified that he and the defendant had used the devices for "[s]urveillance" purposes. A second witness, John Bedard, testified that "we have used [the walkie-talkies] for quite a while." The defendant maintains that these statements constituted inadmissible evidence of prior crimes. *See State v. Woodbury,* 124 N.H. 218, 469 A.2d 1302 (1983); *see also State v. LaBranche,* 118 N.H. 176, 385 A.2d 108 (1978). We disagree. There were no references in this *specific* testimonial context to crimes in which the defendant was involved other than the one with which he was charged. The term "surveillance" and the reference to prior use did not, without more, indicate that the purposes for which the walkie-talkies had been used on prior occasions were illegal. There was thus no reference to prior crimes, and the motions for mistrial were properly denied.

■ An issue common to both cases is the propriety of Trooper Arnold's search of the bank bag found on the floor of the driver's side after the stop of the Wellman vehicle in Maine. On appeal, the defendant has properly raised only the issue of whether the search was illegal under the fourth amendment to the United States Constitution. We therefore do not address the issues of whether the New Hampshire Constitution would be applicable to Maine police officers conducting a search in the State of Maine or whether, assuming that it would be so applicable, the warrantless search of the bag was permissible under the New Hampshire Constitution, part I, article 19. In addition, we will reach only the issue of whether the *search* of the bag was constitutional, since counsel for the defendant expressly waived the *seizure* issue at the suppression hearing below, stating that "I would not contest any of the happenings prior to Trooper Arnold's search of the bag."

The fourth amendment provides that:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

U.S. CONST. amend. IV. The exclusionary rule requires the suppression of evidence in a State criminal prosecution if it was obtained by means of a federal constitutional violation. *Mapp v. Ohio,* 367 U.S. 643 (1961).

The parties dispute the applicability to the facts of this case of *United States v. Ross*, 456 U.S. 798 (1982), which held that when the police properly stop an automobile, and have probable cause to search the entire car, no warrant is required, and all containers and packages inside the vehicle that may conceal the object of the search may be searched as well. The defendant argues that in this case, unlike *Ross*, there was no probable cause to search the vehicle, even though the stop was justified. He distinguishes *Ross* on its facts, noting *inter alia* that here the Maine police had no description of the driver, that at the time of the stop an hour had elapsed since the incident, and that the number of persons in the vehicle was inconsistent with the police reports. The State, on the other hand, emphasizes the sizable amount of evidence known to the police at the time of the stop. Because we hold that Trooper Arnold alone had probable cause to search the vehicle, we need not reach the State's argument regarding the so-called "collective knowledge" rule. *See United States v. Hawkins*, 595 F.2d 751, 752–53 n.2 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 910 (1979).

According to the United States Supreme Court, a probable cause determination involves a commonsensical analysis of the facts in any given case: "It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' . . . that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). In the instant case, at the time of the stop, Trooper Arnold had received a significant amount of information concerning the crime and the events that followed it. He knew that the suspect vehicle was maroon or cranberry-colored, that it was large, and that it had distinctive "opera lights." Chief Fogarty, Chief of Police of the town of Ossipee, testified that he had requested that the Maine police be given information that the vehicle had Maine license plates. However, Trooper Arnold testified that he was not aware of that particular bit of information. In addition, Arnold was aware that the vehicle in question was heading east in his direction. He testified at trial that he had seen no other cars that night in the area where the stop occurred. Indeed, the general area where the vehicle was stopped was rather deserted. In addition, the stop took place late at night, when traffic could be expected to be less heavy than during the day. The defendant's reliance on reports that more than one suspect were supposed to be in the vehicle misconstrues the actual information obtained by police that night. Arnold was informed that "probably" four suspects were involved.

The actual number was indefinite and the presence of only one person in the Wellman vehicle was thus not inconsistent with this description. *See United States v. LaVallee*, 367 F.2d 351 (2d Cir. 1966).

■ The seized bank bag at issue in this case was seen by Trooper Arnold to be partially concealed under the driver's seat, a suspicious circumstance in itself. The bag's New Hampshire bank markings added to the likelihood that it represented evidence of a crime. In light of all of the circumstances, we hold that Trooper Arnold had probable cause to open the bag and examine its contents. Thus, we conclude that the search was legal and affirm the trial court's determination in this matter. As a result of our holding, we need not address the defendant's contentions regarding the applicability of the plain view doctrine. For the reasons stated, we affirm the defendant's conviction of accomplice to burglary.

## II. *Receiving Stolen Property Conviction*

Wellman also raises two issues relating only to the second trial, which resulted in his conviction for receiving stolen property. First, he argues that the failure of the trial judge to remove a juror from the jury was error because statements made by the juror indicated that she would not be able to serve impartially. We agree with this contention and therefore reverse the conviction.

While the jury was on a view of relevant places connected with the case, Louise Schuknecht, one of the jurors, suddenly realized that the Stapleses' residence was next door to that of her aunt. She approached the trial judge and informed him of this fact. After returning from the view, the judge held an extensive hearing in chambers with counsel present. Deputy Scott Carr, the driver of the vehicle in which Mrs. Schuknecht had been riding, told the judge that she had said that her uncle and aunt had lived next door to the Stapleses and became emotional because she had not been up that road since her uncle died two years before. In addition, he stated that another juror had said in the car on the way back from the view at the Stapleses' residence that she had read in the paper that the Stapleses had been tied up the night their house was ransacked. That juror was later removed from the jury.

Mrs. Schuknecht stated in response to the judge's questions that she had said, "'Oh no, this is my—my aunt lives right next door to these people.'" According to another juror, she had also stated, "'I remember them talking about this. I can't serve on this. This was right next door to my uncle's.'" On voir dire, she told the judge, referring to the defendant: "I mean what if this fellow found out that my aunt lived next door, you know? He might—might be able to

have some bad feelings on that." She also said that she was glad her aunt "hadn't been ripped off." The trial court denied the defendant's motion to remove the juror and stated that defense counsel's argument "could apply to any one of these jurors or any prospective juror. There is nothing particular about that locale or that road that would necessarily distinguish it from any other locale or road." The court found that the juror had the ability to serve impartially.

 Part I, article 35 of the State Constitution provides that "[i]t is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." This provision for judicial impartiality is applicable as well to jurors. *State v. Prevost*, 105 N.H. 90, 92, 193 A.2d 22, 24 (1963). Further, RSA 500-A:12, II states that "[i]f it appears that any juror is not indifferent, he shall be set aside on that trial." This standard, however, is difficult to define precisely in the abstract. *See* R. McNAMARA, 1 NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 753 (1980).

> "Whether or not a prospective juror is indifferent, for whatever reason his impartiality is questioned, is a determination to be made in the first instance by the trial court on voir dire. . . . It is then the duty of this court on appeal to evaluate the voir dire testimony of the empaneled jury to determine whether an impartial jury was selected."

*State v. Laaman*, 114 N.H. 794, 800, 331 A.2d 354, 358 (1974), *cert. denied*, 423 U.S. 854 (1975). The determination is necessarily fact-specific and will not be reversed on appeal absent abuse of discretion or a finding that the trial judge's decision was against the weight of the evidence. R. McNAMARA *supra.*

 After a careful review of the relevant passages in the transcripts, we hold that the trial judge abused his discretion and the defendant's motion should have been granted. The connection between Mrs. Schuknecht and the scene of the crime, combined with her statement as to the defendant's possible "bad feelings," which could reasonably be construed to express fear of retaliation on her part, indicate to us that her ability to be impartial, despite her protestations to the contrary, *cf. State v. Rheaume*, 80 N.H. 319, 320, 116 A. 758, 760 (1922), may well have been impaired. We therefore reverse the defendant's conviction for receiving stolen property.

The defendant's second argument, if found to be meritorious, would require dismissal of the second receiving stolen property indictment. As noted above, the defendant's February 11, 1984 arrest was followed by an accomplice to burglary indictment on April 5, 1984. However, he was not indicted on the charge of receiv-

ing stolen property until May 29, 1984, 108 days after his arrest. That indictment was superseded by a later indictment that added the allegation that the property retained had a value greater than $1000. *See* RSA 637:7 and RSA 637:11, I(a). According to the State and the defendant, that later indictment came down on September 18, 1984, 220 days after the initial arrest. We hold that, under the circumstances of this case, the *Hastings* rule requires dismissal of the indictment. Unlike the first trial, in which the timely first indictment for accomplice to burglary was superseded by a second indictment, in the second trial the defendant was not indicted on the charge of receiving stolen property at all until 108 days after his arrest, a period itself longer than that permitted by the *Hastings* rule.

■■ Because the period between arrest and indictment was greater than sixty days, the State was required to demonstrate that the delay was not unreasonable. *See Hastings*, 120 N.H. at 455–56, 417 A.2d at 8. The State failed to do so. It presented no credible evidence as to why the defendant could not have been indicted in April, except that plea negotiations were ongoing and eventually fell through, thereby prompting the State to bring additional charges. All of the facts giving rise to an indictment for receiving stolen property were available in April. The State could have brought the receiving stolen property indictment in April, negotiated a plea bargain with the defendant, then entered a *nolle prosequi* if circumstances had warranted. *See* R. McNamara, 1 New Hampshire Practice, Criminal Practice and Procedure § 494 (1980). Instead, the State waited until the negotiations failed, then pulled the charges from its back pocket at the end of May. Since the State failed to indict the defendant at all within the required period, and since the plea negotiations do not establish the reasonableness required when the *Hastings* time period is not complied with, the first indictment was barred by the *Hastings* rule, and the superseding indictment therefore also was barred and must be dismissed.

In summary, we affirm the defendant's accomplice to burglary conviction, reverse his receiving stolen property conviction, and dismiss the stolen property indictment.

*No. 84-444 affirmed; No. 84-548 reversed; indictment in No. 84-548 dismissed.*

Souter and Johnson, JJ., concurred specially; the others concurred.

SOUTER, J., with whom JOHNSON, J., joins, concurring specially in No. 84-548: I do not disagree that the indictment for receipt of stolen property should be dismissed under *State v. Hastings*, 120 N.H. 454, 417 A.2d 7 (1980). Whether the *Hastings* rule should be reconsidered is, however, a different issue, which has not been raised in this case.