Hillsborough, }
August 7, 1906. }

STATE v. NEWMAN & a.

An objection that evidence adduced is insufficient to establish the facts in issue with the requisite degree of certainty goes merely to the weight of the proof and raises no question of law.

If there is any competent evidence to sustain a verdict, a motion to set it aside as against the weight of the evidence raises no question of law.

Where officers of a corporation are charged with knowingly using funds of the company for the payment of a private debt, their previous statements as to the character of the obligation are admissible in evidence against them.

In a criminal proceeding against one party to a written contract, parol evidence is admissible to show the belief under which he acted, although it may tend to alter or contradict the terms of the instrument.

Where instructions to a jury embody a plain and correct statement of a rule of law, with all the modifications thereof applicable to the particular case, it is not sufficient ground for a new trial that in commenting upon the evidence the rule was repeated, omitting some of its exceptions and qualifications

The recital in a charge of a purely supposititious state of facts and the inferences fairly deducible therefrom, made for the purpose of illustrating to the jury the inconclusive character of certain evidence upon a question at issue, is within the discretion of the trial justice and does not furnish cause for setting aside a verdict.

INDICTMENT, for embezzlement of the funds of the Manchester News Publishing Company, a corporation of which the defendants were officers. Trial by jury and verdict of guilty. Transferred from the January term, 1906, of the superior court by *Peaslee*, J.

The evidence for the state tended to prove that the Manchester News Publishing Company was organized in January, 1901, for the purpose of publishing a newspaper and doing job printing. The defendant Davison was elected treasurer at the first meeting. The corporation issued no stock and acquired no property until several months later. In September, 1901, the capital stock was increased from $15,000 to $25,000, and the defendant Newman was elected president. At a meeting of the directors, held December 23, 1901, Newman and Davison expressed a desire to sell to the corporation a printing press and fixtures previously purchased by them of the Goss Printing Company. They stated that the property had been purchased conditionally, that the vendors had a lien thereon for the purchase price, and that a part of the consideration was unpaid. The directors voted to purchase

the property of the defendants, to issue to them in payment therefor $13,000 of the capital stock of the corporation, to " deliver the same, in consideration of the payment of the purchase price, and to take therefor a bill of sale of the same subject to such conditions as exist between said Davison and Newman and the Goss Printing Company." The clerk of the corporation was instructed to attend to the execution of a "proper bill of sale and other papers." January 1, 1902, a bill of sale of the property was drawn by Fellows, clerk of and counsel for the corporation, and was signed by the defendants. It names the parties, recites the consideration, describes the property, and states that the vendors " warrant the said printing press and fixtures free from all claims and incumbrances of any and all persons whatsoever."

It also appeared from the state's evidence that on September 30, 1901, an account was opened in the First National Bank of Manchester, New Hampshire, in the name of " Manchester News Publishing Company, H. N. Davison, Treasurer." The first deposit of $4,750 was the proceeds of a note for $5,000, signed by the corporation and indorsed by E. S. Whitney and B. F. Welch. The total deposit was $10,667.50 to February 10, 1902, when there was a balance of $2,501.25 ; and on that day the press was accepted, and a check for $1,770, payable to the order of the Goss Printing Company, signed by Newman as president and Davison as treasurer, was drawn upon the First National Bank and given in part payment of the first instalment of $1,875 due upon the property. The check was paid by the bank and charged against the account of the corporation. The state alleged that the check was drawn in fraud of the corporation's rights, and that the transaction constituted the crime alleged in the indictment. The defendants were general managers of the corporation. Although there was no by-law which authorized them to disburse the funds, they paid bills as they came due. Newman knew and approved all that Davison did.

The defendants made two defences: (1) That the money used to pay the instalment on the press was their own; (2) that the instalment was a debt which the corporation had assumed, and that the money used to pay it, if money of the corporation, was devoted to a lawful and proper purpose. Their testimony tended to prove that the corporation was formed to take over a business conducted by them as copartners, and that nothing was done by the company until January, 1902, except to perfect an organization. From October 30, 1900, to January 1, 1902, the defendants did business under the name " Manchester News Publishing Company," and on the former date they opened an account with the First National Bank, under the name " H. N. Davison, Treasurer Manchester

News Publishing Company," which was continued until May, 1901, when they removed the account to the Second National Bank, and thereafter deposited with the latter institution moneys received in their business and drew checks thereon in payment of a considerable part of the bills of the corporation during its existence.

The defendants further testified that prior to the purchase of the press from the Goss Printing Company, and in anticipation of it, they arranged with Whitney and Welch, who were their personal friends, to have the two indorse a note for $5,000 for discount at the First National Bank. This was done on September 30, 1901. The proceeds of the note were deposited to the credit of " H. N. Davison, Treasurer Manchester News Publishing Company," because the defendants were conducting their partnership business in that name. The note was signed "Manchester News Publishing Company, H. N. Davison, Treasurer," and was secured by fifty shares of the stock of the corporation, issued in Whitney's name. The note was indorsed by Whitney and Welch on the credit of the defendants and as a matter of personal friendship. At that time the corporation had neither credit nor property. The subsequent deposits in the First National Bank consisted of a note for $500 given by one Kennard for stock issued to him and proceeds of sales of other stock belonging to the defendants. The account was kept separate from the moneys of the corporation in the Second National Bank, for the reason that the defendants considered that the funds belonged to them. From September 30, 1901, to February 10, 1902, the defendants drew checks upon the First National Bank to the amount of $2,500 in excess of the proceeds of the first note, for the payment of bills incurred in installing the press and running the business; and they did this "because the bills had to be paid, and there was no other money with which to pay them."

It also appeared from the defendants' evidence that on August 1, 1901, they entered into a contract with the Goss Printing Company for the purchase of a press and fixtures. The contract purported to be a lease of the property, and provided for the payment of $7,500, less $500 allowed for an old press. The first instalment of $1,875 became due when the press was set up, and the remaining instalments were payable monthly in varying amounts. In addition to the first instalment of $1,875, the defendants expended about $2,500 in transportation charges and expenses of installation. The value of the press when set up was $15,000, the folder alone was worth $10,000, and a fair rental for the property was $200 a month. When the vote was passed authorizing the purchase of the press by the corporation, both defendants understood

that the company assumed the payment of future instalments. Their attention was not called to the warranty in the bill of sale, and when they signed they assumed that the instrument had been drawn in accordance with the vote of the directors as they understood it.

It further appeared that when the corporation was formed, and later when the capital stock was increased, it was understood that the greater part, if not all, of the stock was to be issued to the defendants for the property which they were to transfer to the company. January 28, 1902, the directors voted to purchase of the defendants the plant used by them as partners, and to issue to them in payment therefor capital stock of the par value of $7,000, " providing the same shall be agreed to by said parties, and a full and complete title is given." A bill of sale of this property was subsequently executed. The defendants understood that the stock voted to them in payment for the press and the plant might be issued by them in such form and to such persons as would best serve their purposes and the requirements of the business. The proceeds of the note for $5,000 and all moneys received from sales of stock were used by the defendants in the company's business and for the payment of its legitimate bills. There was no direct evidence that the funds deposited in the First National Bank came from any other source than the first note and sales of the defendants' stock.

The evidence in rebuttal tended to prove that Whitney understood he was indorsing a note of the corporation and was giving credit to the corporation; that at the annual meeting in February, 1903, Davison, as treasurer, reported that the entire capital of $25,000 had been paid in; that the press in question was worth about $7,500; that the clerk of the corporation, understanding from the defendants' statements that they considered themselves bound to make future payments upon the press, inserted the warranty in the bill of sale for the purpose of securing a clear title, in accordance with the vote of the directors.

At the close of the state's evidence and again at the close of all the evidence the defendants moved that a verdict of not guilty be directed. Both motions were denied, subject to the defendants' exceptions.

Fellows, clerk of the corporation, was called as a witness by the state. He testified that he recalled the substance of several conversations with the defendants, and was then asked: " Who was to pay the balance due to the Goss Printing Company, as they told you?" Subject to the defendants' exception, the witness was permitted to reply. His answer was: " I understood that Davison and Newman were to pay for it."

The court instructed the jury in part as follows, the defendants excepting to the portions enclosed in brackets : "The charge here is embezzlement, and it means that these defendants, having the custody of the funds of the corporation, intentionally used those funds for their own purposes. . . . The state . . . must have shown that the money in the bank was the property of the corporation, that the debt on the press was theirs and not that of the corporation, and that these respondents, well knowing these facts, took the funds to pay their own debts. . . . [Something has been said about a guilty intent; that such an intent must be proved. That is true ; and it is also true that proof of the intent is usually found in the nature of acts knowingly done. If a man stealthily takes your horse from the barn at night, it is sufficient evidence to warrant the conclusion that he intended to steal the horse ; and if he should afterward, upon his trial, testify that he took it because he thought he owned it, his evidence would not be likely to raise a reasonable doubt in your minds. In this case, if the facts are that the debts were those of the respondents, and they took the funds of the company to pay such debts, you are warranted in drawing the inference that they intended to embezzle the funds.] It is also suggested that they may have misunderstood the situation, and therefore that they have a defence on that ground. If such is the fact, the contention is correct, and they are entitled to your verdict ; but on this issue the question is not what they now say about the matter, but what they in fact knew about it at the time of the transaction. . . . If at the time these transactions took place these men understood that the company assumed the debt, and that the debt was the company's and not theirs, and acted upon that belief, they are not guilty. The question is : Did they then so believe, or did they understand that the debt was theirs ? This is the issue for you to decide."

*Edwin G. Eastman,* attorney-general, and *Edward H. Wason,* solicitor, for the state.

*Branch & Branch, Doyle & Lucier, Moodybell S. Bennett,* and *Eugene B. Hayes,* for the defendants.

*George L. Dillaway* and *Coggan & Coggan* (all of Massachusetts), filed a brief for the defendants.

PARSONS, C. J. "If any officer, agent, or servant of a corporation, public or private, . . . shall embezzle or fraudulently convert to his own use any money, bill, note, or security for money, evidence of debt, or other effects or property whatever of such

person or corporation, or in their possession or keeping, or shall knowingly or voluntarily pay or deliver any such money . . . to any person or to the order of any person, knowing that such person is not entitled to receive it, . . . he shall be fined," etc. P. S., *c.* 273, *s.* 17.

There was evidence tending to show that the deposit in the First National Bank to the credit of the Manchester News Publishing Company was the property of that corporation; that the claim of the Goss Printing Company was the debt of the defendants, and that no liability therefor had been assumed by the corporation; and that the defendants, knowing these facts, and having as officers of the corporation possession of the money owned by or in the possession and keeping of the corporation, knowingly applied the corporate funds to the payment of their private debt.

If the facts which the evidence tended to prove were established with the requisite degree of certainty, a violation of the statute was made out. The objection, that the evidence was insufficient to establish the facts in issue with that degree of certainty, is merely to the weight of the evidence and raises no question of law. The claim that "if in connection with the act which is alleged to be criminal there are other facts and circumstances which negative the existence of a criminal intent or are consistent with innocence, then a conviction cannot be had" may be sound, but it has no application here; for there are no facts or circumstances whose existence is conceded, or which are so conclusively proved as to be beyond dispute, which "negative a criminal intent" or are "consistent with innocence." It is not conceded or conclusively established that the money in the bank was the defendants', or that the debt was the corporation's to pay, or that the defendants misunderstood the situation. All these facts were in dispute before the jury; and if there was evidence to support the state's claim, it cannot be held as matter of law that any one of them is established by the contrary evidence, or by the presumption of innocence. As the defendants did not rest their case upon their motion for a verdict made at the close of the state's case, but proceeded to introduce evidence, the question is whether the whole case contains any evidence for the jury.

The defendants, having done business as a copartnership under the name of the Manchester News Publishing Company, formed a corporation with the same name. Before this their bank account was kept in the name of H. N. Davison, treasurer Manchester News Publishing Company. Soon after the vote (September 23, 1901) making the capital stock of the corporation $25,000, an account was opened (September 30, 1901) under the name " Man-

chester News Publishing Company, H. N. Davison, treasurer."
There was direct evidence that the deposit with which this account
was opened ($4,750) was the property of the corporation, and that
claims against the corporation were paid from this account. The
defendants contended that all other deposits to this account came
from sales of stock belonging to them; but there was no evidence
of the issue of any stock to them until the issue of $13,000 for
the press was authorized on December 23, 1901, and the transac-
tion completed by the bill of sale of January 1, 1902, before which
dates there had been additional deposits amounting to $2,792.50.
The act charged as embezzlement was a payment made from this
account. That the account stood in the name of the corporation,
changed from the form used by the copartnership, and that moneys
belonging to the corporation were deposited in the account and
claims against it paid therefrom, was evidence tending to show
that the account represented money belonging to the corporation.
Whether the defendants' explanation was true, and what inference
should be drawn from the inability of the defendants to tell from
whom they had received the money deposited in the account, was
for the jury.

The language of the vote of the directors was evidence as to the
terms upon which the press was purchased by the corporation.
Other evidence consisted of the bill of sale signed by the defend-
ants and the oral testimony. But the vote of the directors even
does not conclusively establish that the corporation were to pay
the defendants $13,000 in capital stock for the press and then pay
the parties of whom it was purchased substantially the full pur-
chase price. The directors voted to purchase of the defendants
the press and fixtures at a price not exceeding $13,000, and to pay
for it in capital stock at par. This language is at least open to the
inference that complete title to the press was to be acquired by the
corporation by the issue of $13,000 capital stock. It being under-
stood that Davison and Newman had not a complete title, the title
that could be then acquired from them would necessarily be sub-
ject to the conditions then attached to the press. The instruc-
tions to the clerk to see to the execution of "the proper bill of
sale and other papers" might indicate an understanding that
something more than a mere bill of sale would be necessary to
secure to the corporation complete title to the press in exchange
for the capital stock. There is no necessary conflict between the
vote of the directors and the bill of sale. The directors voted to
buy, not the interest of Davison and Newman, but the press. The
bill of sale conveys what the directors voted to buy, and warrants
the title. Assuming that Davison and Newman were responsible,
this was a simple method of carrying out the vote and authorizing

the issue of the $13,000 capital stock. The vote may have contemplated "other papers" to secure the warranty of the bill of sale; but whether the mere bill of sale with warranty was or not a complete execution of the duty imposed on the clerk, the evidence of the record of the directors' vote does not conclusively establish that the corporation bought Davison's and Newman's title instead of the " press and fixtures." What inference should be drawn from a comparison of the vote to purchase the press with the vote of January 28, 1902, to purchase the Hanover-street plant in exchange for $7,000 of the capital stock at par, " providing . . . a full and complete title is given by the company," was also for the jury. If it can properly be argued therefrom that in the case of the press only the interest of the defendants in the contract for the press was purchased, it may also be suggested that the reason for the definiteness of the second vote was the better understanding of the character of the defendants' title to the press and an unwillingness to take other property from them upon their warranty of title. There being some evidence to sustain the state's case, the motion to set aside the verdict as against the weight of the evidence raises no question of law.

The objection to the testimony of Fellows, that his understanding of the contract evidenced by the bill of sale was incompetent, is sound as matter of law as stated, but is not sustained by the record. The witness was not asked for his understanding, but for what the defendants told him. The question to which objection was made and to which the exception relates was competent. If the defendants thought the answer of the witness might be understood as giving his own understanding of the contract, for which he was not asked, instead of the substance of what the defendants said, for which he was asked, the matter could have been made clear by cross-examination, or the answer could have been objected to as irresponsive. No objection to the answer was taken. The only fair and intelligent construction that can be given to this portion of the record is that the witness intended to give, and must have been understood to have stated, the substance of what the defendants said to him. The objection taken in the brief filed since the argument, that Fellows' testimony was incompetent because the evidence of the contract was all in writing which could not be affected or changed by parol, is not applicable. " In a suit at law between the parties to a written agreement, or those claiming under it, extrinsic evidence is not admissible to contradict or alter its terms. The agreement does not conclude strangers. In a controversy between . . . one of the contractors and a stranger, either party may show by parol that the written contract was made by mistake or fraud, or that by design

of the parties it misrepresents the true transaction." *Libby* v. *Company*, 67 N. H. 587, 588. In this controversy between the state and one of the parties to the contract, where the criminal intent of the defendants was in issue, any facts bearing upon the belief under which the defendants acted were competent.    4 Wig. Ev., s. 2446 ; *Walker* v. *State*, 117 Ala. 42.    If such evidence could not have been received, the bill of sale as conclusive evidence of the contract finally made would have established, against the defendants' contention, that the debt which they were charged with paying from the funds of the corporation was their own debt, and their own parol evidence of their understanding must have been excluded.    Furthermore, Fellows' evidence did not contradict, change, or alter the meaning of the bill of sale to which alone it related, and if incompetent on the ground suggested was immaterial and not prejudicial, since it only tended to prove a point, on the contention now made, already conclusively proved.    *State* v. *Blaisdell*, 59 N. H. 328 ; *Foye* v. *Leighton*, 24 N. H. 29, 38.

The charge contained the following sentence :  " In this case, if the facts are that the debts were those of the respondents, and they took the funds of the company to pay such debts, you are warranted in drawing the inference that they intended to embezzle the funds."    Objection is now made, in support of an exception taken at the time, that this statement excluded from the consideration of the jury the belief under which the respondents acted.    It does not appear that this omission, if erroneous, was called to the attention of the court at the time.    There was no occasion to do so ; for in the following sentence the court referred to the suggestion that the defendants may have misunderstood the situation, and said that if such were the fact the defendants were entitled to a verdict.    Earlier in the charge the jury were told that to authorize a verdict of guilty it was incumbent upon the state to prove that the " defendants, having custody of the funds of the corporation, intentionally used those funds for their own purposes ; . . . that the money in the bank was the property of the corporation, . . . and that these respondents, well knowing these facts, took the funds to pay their own debts."    The court also adopted and approved the contention of the defence, that the state was bound to prove the acts charged as constituting the offence were done with guilty intent.    Whatever inference might be drawn from the sentence by itself, the whole paragraph in which it appears does not exclude, but expressly includes, the belief under which the defendants acted as an element of the crime charged against them. And the point was impressed upon the jury at the close of the instructions, when they were told that " if at the time these transactions took place, these men understood that the company assumed

the debt, and that the debt was the company's and not theirs, and acted upon that belief, they are not guilty. The question is: Did they then so believe, or did they understand that the debt was theirs? That is the issue for you to decide." Taking into account all that was said, plainer language could not be found to inform the jury that a mistaken belief as to their right excused the defendants. If the legal rule is correctly stated to the jury with all the exceptions and qualifications applicable, it is not a sufficient ground for a new trial that in commenting upon the evidence the rule was repeated, omitting some of the exceptions or qualifications. *Cohn* v. *Saidel*, 71 N. H. 558, 571; *Saltmarsh* v. *Bow*, 56 N. H. 428; *Belknap* v. *Wendell*, 36 N. H. 250.

Exception was also taken to the instruction of the court that proof of the intent is usually found in the nature of acts knowingly done, and to the illustration used. The jury were told that what the defendants now said was not conclusive, but was evidence for the jury to consider and give such weight to as they deemed just. It is not claimed there was error of law in these statements, but the objection now urged relates solely to the illustration used. The court said: "If a man stealthily takes your horse from the barn at night, it is sufficient evidence to warrant the conclusion that he intended to steal the horse; and if he should afterward, upon his trial, testify that he took it because he thought he owned it, his evidence would not be likely to raise a reasonable doubt on the subject in your minds." Even in jurisdictions where the common-law rule which permits the judge to give to the jury his opinion of the weight of a part or of the whole of the evidence, leaving the jury to pass thereon, has been abrogated by constitutional or statutory provisions forbidding a charge upon the facts or upon the weight of the evidence, what was said might not be considered objectionable. No opinion was expressed as to the credibility of the defendants as witnesses. The suggestion related merely to the value of a class of evidence. *Durant* v. *Burt*, 98 Mass. 161; *Commonwealth* v. *Larrabee*, 99 Mass. 413; *Harrington* v. *Harrington*, 107 Mass. 329. But the common-law rule has not been changed by statute in this state, and the constitution contains no reference to the subject. The defendants' citations from jurisdictions controlled by such provisions are not applicable. The power of the court at common law of " advising the jury as to the nature, bearing, tendency, and weight of the evidence, . . . a duty which from its very nature must be, in a great measure, discretionary on the part of the judge " (1 Stark. Ev. *440), even to the extent of expressing an opinion upon the merits of the case, is recognized in England, in the federal courts, and in states where the lawmaking power has not interfered to change the practice.

*State* v. *Pike*, 49 N. H. 399, 417; *State* v. *Reed*, 62 Me. 129; *Rowell* v. *Fuller*, 59 Vt. 688, 695; *Commonwealth* v. *Child*, 10 Pick. 252, 256; *Matthews* v. *Allen*, 16 Gray 594, 596; *State* v. *Duffy*, 57 Conn. 525; *Jackson* v. *Rowland*, 6 Wend. 666, 669; *Massoth* v. *Canal Co.*, 64 N. Y. 524, 533; *Gordon* v. *Little*, 8 S. & R. 533,—11 Am. Dec. 632, 639; *Mitchell* v. *Harmony*, 13 How. 115, 130, 131; *Allis* v. *United States*, 155 U. S. 117, 123; authorities collected in 11 Enc. Pl. & Pr. 91, 93; Sackett Inst. Jur. 8.

In the absence of decisions in point, it may be difficult to determine the precise limit which uniform practice in this state has placed upon the discretion of the trial judge in charging the jury as to the facts. *Doe*, J., in his dissenting opinion in *State* v. *Pike*, 49 N. H. 399, 416, refers to the common-law practice as obsolete in this state, and in subsequent opinions he refers to the English practice of the judge advising the jury on the facts and weight of the evidence as though it was unknown here. *Lisbon* v. *Lyman*, 49 N. H. 553, 572; *State* v. *Hodge*, 50 N. H. 510, 520; *Gray* v. *Jackson*, 51 N. H. 9, 15; *Aldrich* v. *Wright*, 53 N. H. 398, 404; *Orr* v. *Quimby*, 54 N. H. 590, 632 (dissenting opinion). But no case is to be found where a verdict has been set aside because of the comments of the court upon the evidence. The opinion in *State* v. *Pike* is reported as of June, 1870. Among the authorities cited by Judge *Doe* is *Nutting* v. *Herbert*, 37 N. H. 346, 355, decided in July, 1858, in which it was expressly held that "observations of the court upon mere matters of fact, and their commentaries upon the weight of evidence and its application, are understood to be addressed to the jury merely for their consideration as the ultimate judges of matters of fact, and are entitled to no more weight or importance than the jury, in the exercise of their own judgment, choose to give them. They neither are, nor are understood to be, binding upon them, as true and conclusive expositions of the evidence; and therefore whether perfectly correct and appropriate or not, a bill of exceptions does not lie to such observations and commentaries." It is not probable that Judge *Doe* intended, in 1870, to describe as obsolete a practice recognized by the court as in existence twelve years before. His remark is to be understood in the light of the rule on the subject laid down and approved in several earlier cases. "It is not the ordinary practice in this state for the court to express opinions upon the weight of evidence; . . . but it is not irregular for them to make such suggestions in relation to the facts as they may suppose will be useful to the jury, the matter being left to the jury for decision." *Cook* v. *Brown*, 34 N. H. 460, 470. A similar statement of the practice is approved in *Patterson* v. *Colebrook*, 29 N. H. 94, 102. In *Flanders* v. *Colby*, 28 N. H. 34, the court suggested

to the jury that they could better judge of the credit to be given to a witness by his appearance on the stand than by any other circumstances. In the opinion *Gilchrist*, C. J., said: "The judge must make such suggestions upon the evidence as he deems most proper. This is a matter which cannot be limited." The substance of the rule as stated in the cases appears to be that the extent to which the facts shall be stated in the charge, and the commentaries to be made upon them, is for the trial judge, and that his action is not open to exception. Cases *supra; Beach* v. *Hancock*, 27 N. H. 223, 230; *Rollins* v. *Varney*, 22 N. H. 99; *Haven* v. *Richardson*, 5 N. H. 113, 126. In view of the reported cases, it is probable it was not intended, in the dissenting opinion in *State* v. *Pike*, to characterize as obsolete a practice of making general suggestions as to the evidence, which would tend to aid the jury in coming to a result and which in one view may be considered comments upon the weight of evidence, but that the judge had in mind the English practice of giving to the jury the view of the court upon the particular case or evidence before them. In *McDougall* v. *Shirley*, 18 N. H. 108, 109, there is a suggestion by *Parker*, C. J., to the effect that the expression of personal opinion by the judge in the charge might be error.

As suggested, in the absence of any decisions the precise line which bounds the discretion of the court may be difficult to define. For a judge to inform the jury how he thought the evidence in which a fair conflict existed ought to be determined would probably appear to all lawyers now in practice an invasion of the province of the jury. Upon the general grounds of a violation of uniform and invariable practice and a denial of the right to a fair trial by the jury, and from the manner in which the distinction between law and fact is now drawn in this state (*State* v. *Hodge*, 50 N. H. 510, 526), all would probably agree that such a proceeding should and would vitiate a verdict found in conformity thereto; but authorities would not be wanting to sustain it. There is no probability that such a case will ever arise, and it is not necessary now to seek the reasons why such a proceeding would constitute legal error, or to attempt to define the precise line between fair and unfair comment. In the present case, the only purpose of the illustration used, of which there was no pretence there was any evidence in the case (*Simonds* v. *Clapp*, 16 N. H. 222; *Nutting* v. *Herbert*, 37 N. H. 346), was to make clear to the jury that they were to pass upon the understanding of the defendants at the time of doing the acts charged in the indictment, and that they were not bound by the statements made by the defendants at the trial. The remark had no bearing on the preliminary questions before the jury—whether the debt was the defendants',

and the money used to pay it the corporation's. Unless both of these facts were found against the defendants, their understanding was immaterial. Being made material by the finding against them, it was proper that the attention of the jury should be directed to the character of the evidence which they were to consider in determining it. What was said was within the limits of the discretion recognized by the New Hampshire cases cited to be within the province of the presiding judge. It does not appear that the defendants were prejudiced or the jury misled.

*Exceptions overruled.*

All concurred.