THE STATE OF NEW HAMPSHIRE

v.

STEPHEN A. BAILEY

December 4, 1985

*Stephen E. Merrill*, attorney general (*Gregory W. Swope*, assistant attorney general, on the brief), by brief for the State.

*Joanne S. Green*, assistant appellate defender, of Concord, by brief for the defendant.

SOUTER, J.   A jury found the defendant guilty of second degree assault committed by causing bodily injury to an infant boy recklessly and under circumstances manifesting extreme indifference to the value of human life. RSA 631:2, III. In this appeal the defendant argues that the Superior Court (*Dunn*, J.) committed four errors: (1) in refusing to enquire on voir dire whether the allegation of assault on a small child would cause emotional reaction or discomfort to a juror; (2) in refusing to make a record, in the presence of counsel, of bench conferences with prospective jurors; (3) in admitting expert testimony on the fatal tendency of the defendant's course of conduct;

and (4) in refusing to give a jury instruction indicating that the defendant could not be found guilty unless the acts charged in the indictment had jeopardized the life of the victim. We conclude that there was no reversible error and affirm.

On the evidence, the jury was entitled to find that during part of the fall of 1983 the defendant lived in an apartment occupied by the child victim and his mother. When his relationship with the mother deteriorated, the defendant became intolerant of the child's crying. From about the time of Thanksgiving, 1983, when the child was approximately eleven months old, the defendant responded to the child's noise by striking and biting the child's body.

By December 11, 1983, these assaults had left scratches, bruises and scarred marks of the defendant's teeth upon the hands, arms, shoulders, legs, back and stomach of the child. On that date a baby-sitter reported the child's condition to the police, who took the child to the hospital, from which he was later removed to foster care. A pediatrician, Dr. McGrath, stated that his examination of the child at the hospital revealed the worst case of child abuse the doctor had ever seen, and he expressed the opinion that a few more days of such treatment would have resulted in the child's death.

A few hours after the child had been taken from his mother's apartment, the defendant called the police and shortly thereafter went to the police station to discuss the matter. There, the defendant admitted the assaults and said he was extremely sorry that he had committed them. The defendant was subsequently indicted for the felony of second degree assault under RSA 631:2, III (Supp. 1983), for having recklessly caused bodily injury under circumstances manifesting extreme indifference to the value of human life.

Two aspects of the jury selection at the defendant's trial concern us in this appeal. The defendant requested the court to ask as part of the voir dire whether "the allegation that the defendant inflicted injury on an 11-month old child causes discomfort or [provokes] an emotional reaction within you?" The trial judge declined to pose this specific question. He did, however, advise the jury that the victim was eleven months old at the time of the assaults charged, and he then asked whether any venire panelist, or a panelist's friend or relative, had been abused as a child, and whether any panelist felt any prejudice that would interfere with his judgment.

Defense counsel had anticipated that in conducting this voir dire the court would follow the common New Hampshire practice, in cases other than capital and first degree murder, of posing a series of questions to the panel, followed by individual discussions at the bench with any panelists who indicated that they had affirmative responses to any of the questions. *See* R. MCNAMARA, 1 NEW HAMP-

SHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 954 (1980). Counsel asked that such discussions be on the record with counsel present. The court denied the request, conducted the discussions off the record and then advised counsel of the substance of each panelist's comments. In all but one instance the court later excused each panelist who had come to the bench in response to a question.

During the trial the defendant admitted that he had assaulted the child recklessly; but he maintained that the circumstances did not manifest extreme indifference to the value of human life and, therefore, that he had committed nothing more than the misdemeanor of simple assault under RSA 631:2-a, I(b) (Supp. 1983). He consequently objected to the State's offer of testimony from Dr. McGrath that several more days of similar abusive treatment would have resulted in the child's death. In response to the objection, the court found that such testimony would be relevant, but excluded it on the ground that its prejudicial effect would outweigh its probative value. On cross-examination by defense counsel, Dr. McGrath conceded that the injuries did not include broken bones, concussion, damage to internal organs, gross external deformities, respiratory difficulties or infections. Thereupon the court advised counsel that the cross-examination had opened the door to the excluded testimony. Although defense counsel asked the court to reconsider this ruling, he took no exception. On redirect, the doctor testified that:

> ". . . unless the child was urgently taken out of this, you know, the family situation at the time that the indications were that perhaps with the continuing abuse, the child could end up dead. He could be killed by, you know, some more serious injury. He was at risk, at a high risk and very high risk situation. . . . Just from what I had seen and realizing that this was again a continuum situation where who knows what would happen next, that the situation was very high risk and that the child was a very high risk, you know, that perhaps the child could be killed. There have been cases like that, certainly, ongoing cases of abuse terminating in the child's death."

The defendant continued to address the issue of extreme indifference both in closing argument and by request for the following jury instructions:

> ". . . you must be convinced beyond a reasonable doubt that Mr. Bailey's conduct was of the most threatening sort and it is largely by chance that a murder was not committed, otherwise you must return a verdict of not guilty. Thus, if you find Mr. Bailey's conduct did not involve a

high probability of death, then you must find the defendant not guilty."

The court refused this request, but gave the following charge:

"This requirement, circumstances manifesting extreme indifference to the value of human life, means more than just knowing that there is a substantial risk of injury and disregarding that risk. The circumstances must show a blatant disregard for the risk of [sic] human life."

The jury returned a verdict of guilty, and this appeal followed.

■■ We begin by considering the trial court's refusal to ask the particular voir dire question that the defendant requested, whether the allegation of harm to a small child would cause "discomfort" or "emotional reaction." In *State v. Wright*, 126 N.H. 643, 496 A.2d 702 (1985), we recently had occasion to describe the circumstances in which a trial court is obligated to supplement the standard voir dire when a defendant requests it. A defendant is entitled to supplemental questions "when there is an articulable factual basis, specific to a venire panelist or to the circumstances of the case, for concluding that one or more members of the venire panel may be prejudiced or otherwise incompetent." *Id.* at 648, 496 A.2d at 705. Conversely, there is no abuse of discretion in a court's refusal to expand voir dire because of "mere possibilities" that a panelist may be disqualified. *Id.*

■■ We believe that the details of the charge of assault in this case were so bizarre and shocking that they did provide an articulable basis to conclude that venire panelists might become disqualified by their reactions to the evidence. We do not, however, find any error in the court's refusal to ask the question requested by the defendant. On the one hand, the enquiry about possible discomfort or emotional reaction was calculated to call for an affirmative response from virtually everyone. It would therefore have had little, if any, utility in identifying an unqualified panelist. On the other hand, the court addressed this issue by disclosing the victim's age before asking if there were panelists who thought that they could not act with impartiality. The court then singled out victims of child abuse, and their friends and relations, before making a further, specific enquiry. We cannot say that these responses to the defendant's request were so inadequate as to have been an abuse of discretion, and accordingly we find no error. We will leave the matter, as we did in *Wright*, simply by recommending to the trial courts a receptive rather than a grudging response to requests for supplemental voir dire.

Next we take up the defendant's argument that the refusal to conduct discussions with venire panelists on the record in the presence of counsel was a violation of the defendant's rights under part I, article 15 of the Constitution of New Hampshire and the sixth and fourteenth amendments of the Constitution of the United States. As is customary, we first consider the State claim independently, *see State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing authority from other jurisdictions solely for its help in dealing with the State issue. *See Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983).

Obviously, neither constitution contains any black letter requirements to conduct colloquies with venire panelists in the presence of counsel or on the record. These issues therefore call for judgments about the procedures that are reasonably necessary to promote the objective of ensuring fairness and impartiality among jurors. Our consideration will begin with a look at current practice.

Except in first degree and capital murder cases, it has been customary in this State for the court to speak to a venire panelist outside the hearing of counsel, then to speak with counsel alone at the bench to communicate the substance of the panelist's response and to consider whether that response amounts to cause for excusing the panelist. The comparatively personal colloquy between panelist and court has been thought to minimize awkwardness and promote candor from the panelist. *See United States v. Pappas*, 639 F.2d 1, 2 (1st Cir. 1980), *cert. denied*, 451 U.S. 913 (1981). The risk in this practice, however, is that the court's account to counsel may fail to carry the flavor of the panelist's comment. This risk has traditionally been considered slight because a record of both sets of conversations is customarily made, enabling this court to review the process if a question should arise later about the propriety of excusing or failing to excuse a given juror. Where there is such a record we believe that the risk is truly slight, and we would see no constitutional infirmity in the customary practice.

■■ The promotion of comfort and candor does not, however, require or justify colloquies off the record, *see id.* at 3, for without a record jury selection is virtually unreviewable. Indeed, we cannot think of any statement made in the course of criminal proceedings before the court that should not be subject to counsel's absolute right to a record upon request. Accordingly, we hold that constitutional policy requires a record of the discussions at issue here, and that the refusal to provide a record will require reversal unless it appears beyond a reasonable doubt that the error was harmless. *See State v. Munson*, 126 N.H. 191, 193, 489 A.2d 646, 647 (1985).

■ Although this standard raises a high hurdle, the record of jury selection in this case convinces us that the error was a harmless one. In the course of initial jury selection, a total of thirteen panelists indicated to the judge that there was or could be reason for disqualification. The judge excused twelve of them for cause. The thirteenth answered that he thought "there might be" a reason to excuse, but after the court's discussions with him, and with counsel, he was retained without objection. Although we do not know what the panelist told the judge, we do know two things that make it highly unlikely that the judge would have allowed an unqualified juror to be retained. We know, first, that the judge had no general reluctance to excuse for cause, for he had just done that a dozen times. We know, second, that there is no reason to fear that he was becoming progressively reluctant to excuse as the jury pool diminished, for at the time the thirteenth panelist's qualifications were in question, the judge had had a new pool brought into the courtroom, and there was no risk of running out of panelists. We therefore find it highly unlikely that the judge was in any way reluctant to disclose facts amounting to cause to challenge the thirteenth panelist, and we believe that there was only a very remote chance that a record of the panelist's statement would have revealed any indication of disqualification. Accordingly, we conclude that State law does not call for reversal.

In support of his identical federal claim under the sixth and fourteenth amendments, the defendant relies on *United States v. Pappas*, 639 F.2d 1 (1st Cir. 1980), *cert. denied*, 451 U.S. 913 (1981). There the United States Court of Appeals for the First Circuit considered a challenge on fifth and sixth amendment grounds, *inter alia*, to the practice followed here. The court expressed its disfavor with the procedure, which it understood would no longer be followed, but affirmed the conviction nonetheless.

■ The First Circuit noted that after the district court's original enquiry, defense counsel could have questioned the panelists himself but did not do so and did not exhaust his peremptory challenges. *Id.* at 3. In the present case there was no opportunity for individual voir dire, and it appears, though it is not certain, that the defendant's peremptory challenges were exhausted. If we were to consider only these distinctions, then, *Pappas* would not be federal authority for affirming the judgment now before us. But the First Circuit also took into account the district court's demonstrated willingness to excuse for cause, which it had done in twenty-three out of twenty-five questionable cases. Thus, a probability analysis like the one we have just employed was considered relevant in assessing the federal

claims in *Pappas*, and we believe that the result under that case should be the same as the result that we have reached in considering the State claim.

We turn now to the issues of evidence and jury instruction going to the State's obligation to prove that the defendant committed the assault "under circumstances manifesting extreme indifference to the value of human life." RSA 631:2, III (Supp. 1983). This was the issue on which the State offered the doctor's testimony about the life-threatening tendency of the acts. We note at the outset that the defendant did not preserve his objection to this testimony, for he took no exception to its admission, *see State v. Marshall*, 126 N.H. 226, 489 A.2d 1144 (1985); *cf.* N.H. R. Ev. 103(e) (taking of exceptions is no longer necessary effective July 1, 1985). Nothing turns on the failure to except, however, for there was no error in admitting the opinion.

The defendant asserts that the testimony was inadmissible to prove circumstances manifesting extreme indifference because it was not probative of anything relevant on this issue. He argues that the doctor's opinion described the effect of assaults that might have occurred in the future, whereas only the character of the actual assaults was relevant. Thus he submits that it was error to admit the doctor's opinion.

■ This argument rests on three fallacious assumptions, the first being that the particular assaults actually committed must be life-threatening, in order to support the inference that the defendant committed them with extreme indifference to life's value. On the contrary, the injury required for an offense under RSA 631:2, III (Supp. 1983) is only "bodily injury," not "serious bodily injury." *See* RSA 631:2, I (Supp. 1983); RSA 625:11, VI. Thus, the "injury," or series of injuries, charged need not themselves threaten life.

■ The second fallacious assumption in the defendant's argument is that evidence of extreme indifference must be limited to the injuries resulting from the actual assaults committed. The statute, rather, requires proof that the "circumstances" of the crime manifest extreme indifference; neither the statute nor common sense limits the relevant circumstances to the injuries themselves.

■ The third fallacious assumption is that the doctor's testimony did nothing more than describe further assaults that might have occurred. What the doctor described was the natural tendency of a course of conduct that included the actual assaults and that could, if continued, have caused death. From this evidence of the fatal tendency of the defendant's course of conduct the jury could

infer an indifference to that tendency. The testimony was clearly admissible.

The remaining issue arises on the exception to the trial court's refusal to instruct the jury that the State must prove that the defendant's "acts manifested extreme indifference to the value of human life . . . [such that] it is largely by chance that a murder was not committed. . . ." In support of his request for this instruction the defendant cited the comments to the 1969 Report of the Commission to Recommend Codification of Criminal Laws, advocating enactment of the present statute. The report noted that the justification for allowing a non-serious injury to be the basis for a felony conviction is the threatening nature of its circumstances, in which "it is largely by chance that a murder was not committed." REPORT OF COMMISSION TO RECOMMEND CODIFICATION OF CRIMINAL LAWS, comments to § 576:2 (1969).

For two reasons, we hold that the trial court's refusal to give the requested instruction was proper. First, the statement of the law as requested by the defendant could have misled the jurors. Taken out of context, the language of the 1969 report could easily have been taken to require proof that the acts of assault as charged in the indictment could, without more, have caused death. As we have seen, this is not the law. Indeed, an instruction that could be understood that way would read RSA 631:2, III (Supp. 1983) right off the books.

Second, the court is not obligated to give the particular language of any requested instruction, so long as the court otherwise instructs the jurors accurately. *State v. Sands*, 123 N.H. 570, 613, 467 A.2d 202, 230 (1983). In this case, as we have noted, the court charged the jury that proof of circumstances manifesting extreme indifference required more than a demonstration that the defendant had disregarded a substantial risk. It required proof of "a blatant disregard" for the risk to human life. Assuming that "extreme indifference" needs elucidation at all, the court's instruction was sound. We approved a significant part of its language in *State v. Howland*, 119 N.H. 413, 416, 402 A.2d 188, 191 (1979), and have since affirmed its propriety in *State v. Dow*, 126 N.H. 205, 207, 489 A.2d 650, 652 (1985). There was no error.

*Affirmed.*

JOHNSON, J., did not sit; the others concurred.