Carroll
No. 92-302

## THE STATE OF NEW HAMPSHIRE

v.

## ALLAN Y. WONG

December 17, 1993

*Jeffrey R. Howard*, attorney general (*Mark D. Attorri*, assistant attorney general, on the brief and orally), for the State.

*Fredella & Wheeler*, of Somerville, Massachusetts (*Anthony M. Fredella* on the brief and orally), for the defendant.

HORTON, J. The defendant, Allan Y. Wong, was convicted of receiving stolen property, RSA 637:7, I (1986), in connection with his purchase of an outboard motor. On appeal, he argues: (1) that the admission of evidence obtained following a warrantless search and warrantless arrest violated his federal and State constitutional rights; (2) that the State failed to prove that the outboard motor was stolen and that the defendant knew it was stolen; (3) that the prosecutor's inflammatory remarks during closing arguments prejudiced the defendant; and (4) that the Superior Court (*Mohl*, J.) erred by disqualifying a juror, and by failing to immediately dismiss the juror once he had been disqualified. We affirm.

On July 7, 1990, the defendant brought a Boston Whaler boat mounted with a Johnson outboard motor to Northbound Honda, Inc., a marine dealership in North Conway. The defendant, an attorney from Somerville, Massachusetts, requested that Northbound replace the Johnson with a Yamaha outboard motor he had brought with him. The Yamaha, which was packaged in the bottom half of its original shipping crate, was missing its propeller and other parts. The defendant left his business card and telephone number and arranged for Northbound to call him when it had completed the work. Sometime later, Larry Grace, Northbound's service manager, checked the Yamaha's serial number so that he could order parts missing from the motor. When Grace compared the Yamaha's serial number against a printout of outboard motors reported stolen four months earlier from Baert Marine of Danvers, Massachusetts, he discovered that the Yamaha had been stolen. Grace contacted Baert Marine, which in turn notified the police.

On July 20, 1990, Sergeant Jeffrey Dicey of the North Conway Police Department visited Northbound. He was taken into Northbound's workshop where the Yamaha was positioned on a work stand. Dicey confirmed that the Yamaha's serial number was included on the list of outboard motors stolen from Baert Marine. Grace told Dicey that the defendant had delivered the Yamaha, as well as the Boston Whaler and Johnson outboard motor, to Northbound. Grace then brought Dicey outside of the workshop to a separate, fenced-in area and showed him the Boston Whaler and the Johnson. Dicey testified that as he approached the Boston Whaler, he

noticed that the serial number on the Johnson's cover was missing. Grace then removed the cover, and Dicey determined that the serial number mounted on the inside of the motor was also missing. Dicey and another police officer returned to Northbound later that day to photograph the boat and the two motors. Dicey indicated that the State was seizing these items. The police subsequently learned that the Boston Whaler and the Johnson outboard motor had also been reported stolen.

On July 27, 1990, the defendant received a telephone call from Sgt. Dicey, who identified himself as a Northbound employee and told the defendant that his boat was ready. When the defendant arrived at Northbound on the following day, he was met by Dicey, who disclosed that he was a police officer and asked the defendant if he was aware that the Yamaha had been stolen. The defendant said that he had not known the motor had been stolen. He stated that he had purchased the motor from Mystic Appliance in Charlestown, Massachusetts, for $1,200, but noted that he did not have a sales receipt. Dicey immediately arrested the defendant, who was subsequently indicted on two class A felony charges of receiving stolen property. The first indictment pertained to the Yamaha, and the second pertained to the Boston Whaler and the Johnson. The State later entered *nolle prosequi* on the felony charge relating to the Boston Whaler and the Johnson; the defendant's conviction for receiving stolen property concerned the Yamaha.

## I. Motion to Suppress

On appeal, the defendant first contends that the warrantless seizure of the Yamaha motor was unreasonable under both part I, article 19 of the New Hampshire Constitution and the fourth amendment to the United States Constitution, and that this evidence should have been excluded from trial. We address the defendant's State constitutional claim first, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing federal law only to aid our analysis. *State v. Maya*, 126 N.H. 590, 594, 493 A.2d 1139, 1143 (1985).

It is well-settled under the fourth amendment that where a third party validly consents to a search, the police may seize without a warrant any items which they have probable cause to believe are contraband, fruits of a crime, instrumentalities, or "mere evidence." *See Frazier v. Cupp*, 394 U.S. 731, 740 (1969); *Clarke v. Neil*, 427 F.2d 1322, 1324 (6th Cir. 1970). Part I, article 19 of the State Constitution does not require a higher standard. The defendant does not contend — nor could he — that after inspecting the motor's identi-

fication number, Sgt. Dicey did not have probable cause to believe the motor stolen. The sole inquiry for the validity of the motor's seizure, then, is whether there was valid third-party consent to the search. We find that there was.

We do not inquire into the reasonableness of a search when the police have received valid consent to search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Coyman*, 130 N.H. 815, 818, 547 A.2d 307, 309–10 (1988). Consent to search is valid against a defendant when conferred by a third party with "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see Coyman*, 130 N.H. at 819, 547 A.2d at 310. While the issue of third-party consent by a bailee is one of first impression under part I, article 19 of the State Constitution, we find fourth amendment jurisprudence instructive. The general rule distilled from fourth amendment cases is that the validity of bailee consent turns primarily on "the extent to which the bailor made efforts to secure, even as against the bailee, the privacy of his effects." 3 W. LaFave, Search and Seizure § 8.6(a) (2d ed. 1987); *compare United States v. Presler*, 610 F.2d 1206 (4th Cir. 1979) (illegal search where bailee consented to search of locked briefcase whose keys had been retained by defendant) *with United States v. Falcon*, 766 F.2d 1469 (10th Cir. 1985) (valid consent by brother to playing of tape marked "confidential" that defendant had left in brother's room).

Turning to the facts of the present case, we note that the defendant made no efforts to secure the privacy of the outboard motor. To begin with, the defendant delivered the motor to a business with whom he had no prior dealing. The motor was not enclosed in a container — locked or otherwise. Further, it was implicit in the defendant's instructions to switch the motors that Northbound would necessarily become thoroughly acquainted with the motor, and would perhaps refer to the serial number for such purposes as ordering parts. Finally, nothing in the record suggests that the defendant ever instructed Northbound not to show the motor to anyone else. Given these facts, we hold that Northbound validly consented to the police search.

Because the Federal Constitution provides no more protection than the State Constitution, we need not separately consider the defendant's federal claim. *Maya*, 126 N.H. at 594, 493 A.2d at 1143.

The defendant next contends that his arrest was unlawful because it was not supported by probable cause, and therefore his statements

concerning the amount he paid for the Yamaha and the fact that he did not have a receipt for the motor should have been suppressed. The defendant relies upon part I, article 19 of the New Hampshire Constitution and the fourth amendment to the United States Constitution. Again, we begin by addressing the defendant's State constitutional claim, *see State v. Ball*, 124 N.H. at 231, 471 A.2d at 350, and because federal law is not more favorable to the defendant in this area, we do not go on to analyze his federal constitutional claim. *Maya*, 126 N.H. at 594, 493 A.2d at 1143.

The New Hampshire Constitution provides that "[e]very subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions." N.H. CONST. pt. I, art. 19. A threshold question is whether the defendant had been arrested within the meaning of part I, article 19 when he made the statements at issue. If an arrest had occurred, evidence independent of the post-arrest statements must have existed to provide probable cause for the arrest. *See State v. Chaisson*, 125 N.H. 810, 819, 486 A.2d 297, 304 (1984). Moreover, if probable cause was lacking, the defendant's subsequent statements would not cure what was otherwise an unlawful arrest, and any evidence seized following that arrest would be inadmissible at trial. *See id.*

A suspect is considered seized for the purposes of part I, article 19 if, "in view of all the circumstances . . . a reasonable person would have believed that he was not free to leave." *State v. Noel*, 137 N.H. 384, 388, 628 A.2d 692, 694–95 (1993) (quotation omitted). Assuming, for the purposes of this appeal, that the defendant had been seized when he made the statements at issue, we must consider further whether he had been arrested. "Not every seizure . . . rises to the level of an arrest." *Id.* at 388, 628 A.2d at 695 (quotation omitted). A "reasonable perception of loss of freedom to leave signals that a seizure has occurred, but not necessarily that the seizure is an arrest . . . ." *Id.* at 388–89, 628 A.2d (quotation omitted). "[T]he determination of when an arrest occurs depends upon the facts and circumstances of a particular case." *Id.* at 389, 628 A.2d at 695 (quotation omitted). While a warrantless arrest is unlawful if not supported by probable cause, *see Chaisson*, 125 N.H. at 816, 486 A.2d at 301, "there are circumstances under which the police may temporarily detain a suspect for investigatory purposes, on grounds that do not amount to probable cause to arrest," *Maya*, 126 N.H. at 595, 493 A.2d at 1143; *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968). A tempo-

rary detention, or a so-called *"Terry* stop," is lawful under part I, article 19 if "the police have an articulable suspicion that the person detained has committed or is about to commit a crime." *Maya*, 126 N.H. at 595, 493 A.2d at 1143. The scope of the stop "must be carefully tailored to its underlying justification . . . must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* (quotation omitted).

We first find that the defendant's assumed detention did not rise to the level of an arrest until after he made the statements at issue. The detention was not unreasonably intrusive; the defendant was not confined or physically restrained during questioning by Sgt. Dicey. *Cf. State v. Reid*, 135 N.H. 376, 381, 605 A.2d 1050, 1053 (1992) (investigative stop did not rise to level of arrest even though defendant was handcuffed and detained in police cruiser). Moreover, the detention lasted "no longer than necessary to effectuate the purpose of the stop," *Maya*, 126 N.H. at 595, 493 A.2d at 1143 (quotation omitted), which was to ascertain whether the defendant knew the motor was stolen.

In addition, we find that this investigative stop was justified, as the police had an articulable suspicion that the defendant had received stolen property. Sgt. Dicey knew from his prior meeting with Larry Grace that the Yamaha had been reported stolen, and that when delivered by the defendant it was packaged in half of its original crate and was missing several parts. Dicey also knew that the defendant lived in Massachusetts. He might reasonably have suspected that the defendant had brought the Yamaha, as well as the Boston Whaler and the Johnson, to North Conway so as to avoid Massachusetts marine dealers more likely to discover that the property had been stolen. We find no infirmity in the investigative stop of the defendant and conclude that statements made after the stop, but prior to the arrest, were properly admitted at trial. Moreover, the statements, in which the defendant indicated that he did not have a receipt for the Yamaha, and had paid considerably less than the market value for the motor, provided Dicey with sufficient information to believe that the defendant had received stolen property. Thus, even if we assume that probable cause for the defendant's arrest did not exist prior to the making of those statements, the statements established probable cause for the subsequent arrest.

*II. Directed Verdict*

The defendant contends that the trial court erred by denying his motion for a directed verdict at the close of the State's case. The

defendant argues that the State failed to prove beyond a reasonable doubt that he knew the Yamaha was stolen when he purchased it from Mystic Appliance. The defendant further argues that the State failed to prove that the motor — even if it had been stolen — had not been recovered when he purchased it.

■■ To succeed on his motion for a directed verdict, the defendant had to establish that "the evidence viewed in its entirety, giving the State the benefit of all reasonable inferences, was insufficient to prove beyond a reasonable doubt that he was guilty of the crime charged." *State v. Casey*, 113 N.H. 19, 19, 300 A.2d 325, 326 (1973). When reviewing the trial court's denial of the directed verdict, we "must view the evidence and all reasonable inferences arising therefrom in the manner most favorable to the State." *State v. Place*, 128 N.H. 75, 80, 513 A.2d 321, 324–25 (1986). When conducting this review, we consider not only the State's evidence, but also evidence presented by the defendant after his directed verdict motion failed. *See State v. LeNoir*, 97 N.H. 462, 463, 92 A.2d 159, 159 (1952); *State v. Newman*, 74 N.H. 10, 15, 64 A. 761, 764 (1906). A criminal defendant is not required to present a case, but if he elects to do so, he takes "the chance of supplying deficiencies in the State's case." *State v. Barry*, 93 N.H. 10, 12, 34 A.2d 661, 662 (1943).

■■ To convict the defendant of the class A felony of receiving stolen property, the State had to establish that when the defendant received the Yamaha, he either knew it had been stolen, or believed that it probably had been stolen. RSA 637:7, I (1986). We have recognized that "the State is rarely able to prove by direct evidence that a defendant accused of receiving stolen property possessed the requisite guilty knowledge . . . ." *State v. Brown*, 132 N.H. 321, 326, 565 A.2d 1035, 1038 (1989). The State may establish the defendant's knowledge "by any surrounding facts or circumstances from which such knowledge may be inferred." *Id.* (quotation omitted). Two of the "most common factors from which guilty knowledge [may be] inferred are possession of the stolen goods, [and] inadequacy of the price paid for them . . . ." *Casey*, 113 N.H. at 20, 300 A.2d at 327. It is undisputed that the defendant had possession of the stolen Yamaha. In addition, he admitted that he paid only $1,200 for the motor, which had a retail value of approximately $6,500. Other evidence of the defendant's knowledge included his decision to bring the Yamaha to North Conway, rather than have work on the motor performed in Massachusetts. While the defendant testified that North Conway is not far from a cottage in Maine where he intended

to use the boat, he also offered the unlikely explanation that to go to Billerica Yamaha in Massachusetts, "you have got to back a boat up with a trailer, and I can't do that." In addition, despite having told Sgt. Dicey that he did not have a receipt for the Yamaha, at trial the defendant produced a document which he claimed was a receipt from Mystic Appliance for the motor. The owner of Mystic Appliance testified that the document submitted by the defendant was not a receipt from his store, and was not on a form used by his store. He testified further that Mystic Appliance had never sold boats or boat motors. Viewing this evidence in its entirety, we hold that a reasonable juror could have found beyond a reasonable doubt that the defendant knew the Yamaha had been stolen.

The defendant also contends that the State failed to prove that the Yamaha constituted stolen property when it was purchased by him. The defendant does not dispute that the Yamaha was stolen from Baert Marine, but he contends that before he purchased the motor, its legal title had passed to Baert Marine's insurer, which had compensated Baert for the value of the motor. The State, the defendant argues, failed to prove that Baert Marine's insurer did not sell the Yamaha to the defendant, or to a third party who in turn sold the motor to the defendant. We find this argument entirely without merit. To find the defendant guilty under RSA 637:7, I (1986), the jury had to find beyond a reasonable doubt that he received "property of another." It was irrelevant under the statute whether the Yamaha belonged to Baert Marine, an insurer, or any other party. *See State v. Stanley*, 132 N.H. 571, 572–73, 567 A.2d 575, 576 (1989). We note further that as a factual matter, the defendant acknowledged having purchased the Yamaha from Mystic Appliance, not an insurance company, and there was absolutely no reasonable basis for an alternative inference that the motor might have been stolen from Baert Marine, recovered by an insurer, and then sold to Mystic Appliance. Indeed, evidence at trial indicated that Mystic Appliance did not buy or sell outboard motors, and that the engine was still listed as stolen property well after the date upon which it was received by the defendant.

### III. Prosecution's Remarks

The defendant argues that the prosecutor committed reversible error by making inflammatory comments in his closing argument which prejudiced the jury against the defendant. During his closing, while discussing the defendant's motive for bringing the Yamaha to North Conway, the prosecutor made the following comment:

> "[The defendant] knows the local dealers around Boston are going to know there was a big break at Baert Marine. Good chance of it. But up in New Hampshire, up in Carroll County, where the *hicks* live, they aren't going to be able to figure this out."

(Emphasis added.) The defendant did not object to the prosecutor's comment at trial. He now contends that the jurors could have interpreted this comment as reflecting his opinion that the jury was made up of "hicks," and been prejudiced against him.

We find that the defendant waived this argument by failing to object when the prosecutor made the comment. This court will not entertain objections that were not raised during the proceedings below. *See State v. Johnson*, 130 N.H. 578, 587, 547 A.2d 213, 218 (1988). We have specifically held that a criminal defendant's failure to object to allegedly prejudicial statements in a prosecutor's opening or closing argument precludes consideration of the issue on appeal. *See State v. Gruber*, 132 N.H. 83, 94–95, 562 A.2d 156, 163 (1989); *State v. Hopps*, 123 N.H. 541, 545–46, 465 A.2d 1206, 1209 (1983). Accordingly, we find that this issue is not properly before us.

*IV. Disqualification of Juror*

The defendant's final arguments concern the trial court's disqualification of a member of the jury. At the close of evidence, the trial court learned that one juror might have been arrested by Sgt. Dicey several years earlier. The court also learned that shortly before trial, the same juror had been convicted of a misdemeanor in connection with the illegal tagging of a deer. During a *voir dire* conducted in chambers outside the presence of counsel, the juror stated that he had no recollection of Sgt. Dicey. When asked about his recent arrest and conviction, the juror indicated that the incident had engendered within him a negative view of criminal laws and their prosecution in the State. He later recanted this statement, however, and said that the incident would not prevent him from objectively reviewing the evidence in the present case. The trial court described the *voir dire* to counsel and granted the State's motion to disqualify the juror. The court, however, decided not to "single [the juror] out at this point and send him home." Instead, it resolved to select the juror as an alternate, while "hav[ing] it appear to the jury" that the selection was conducted at random. The court overruled the defendant's objection to this procedure, and after issuing jury instructions, it designated this juror as an alternate and dispatched the remaining twelve jurors to begin deliberations.

The defendant first contends that the trial court erred by conducting the *voir dire* outside the presence of counsel. The manner of conducting the *voir dire* is a matter entirely within the trial court's discretion. *See State v. Bone*, 131 N.H. 408, 412, 553 A.2d 775, 777 (1989). Moreover, except in capital cases, it is the settled practice in New Hampshire for the trial court to conduct its questioning of individual jurors outside the hearing of counsel. *See State v. Bailey*, 127 N.H. 416, 421, 503 A.2d 762, 767 (1985); R. MCNAMARA, 2 NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 914, at 318 (1991). The trial court then communicates the substance of the *voir dire* to counsel and considers whether to excuse the jurors. *See Bailey*, 127 N.H. at 421, 503 A.2d at 767. This practice, which is intended to minimize awkwardness and promote candor, comports with the defendant's constitutional rights to due process and a fair trial so long as a record of the voir dire is preserved and made available to the defendant. *See State v. Brodowski*, 135 N.H. 197, 201, 600 A.2d 925, 927 (1991); *State v. Castle*, 128 N.H. 649, 652, 517 A.2d 848, 850 (1986); *Bailey*, 127 N.H. at 421, 503 A.2d at 767. In this case, a record of the *voir dire* was provided to the defendant, and the trial court discussed the substance of the juror's responses with defense counsel. We thus find no infirmity in the manner in which the trial court conducted the *voir dire*.

The defendant next contends that the trial court lacked grounds for disqualifying the juror. Under RSA 500-A:12, II (1983), "[i]f it appears that any juror is not indifferent, he shall be set aside on that trial." The question of whether a juror is capable of rendering a fair verdict "is necessarily fact-specific and will not be reversed on appeal absent abuse of discretion or a finding that the trial judge's decision was against the weight of the evidence." *State v. Wellman*, 128 N.H. 340, 348, 513 A.2d 944, 949–50 (1986). In this case, the trial court was justified in concluding that the juror's past criminal record, and his contradictory statements during *voir dire*, warranted his disqualification.

Finally, the defendant contends that the trial court erred when it failed to discharge the disqualified juror immediately. Under New Hampshire's system of jury selection, where questioning of jurors is performed by the trial court rather than counsel, it is the trial judge's responsibility to ensure that no unqualified juror serves. *See State v. Colbath*, 132 N.H. 708, 710, 571 A.2d 260, 261 (1990); *State v. Cere*, 125 N.H. 421, 423, 480 A.2d 195, 197 (1984). Jurors found disqualified should be removed from further jury service. *See Cere*, 125

N.H. at 423, 480 A.2d at 197. In this case, the trial court waited and apparently appointed the disqualified juror as an alternate in order to save him from possible embarrassment. This goal, even if well-intentioned, should have been subordinate to the court's duty to ensure the integrity of jury deliberations in a criminal proceeding. Thus, we hold that the trial court erred when it failed to immediately dismiss the disqualified juror.

 We must next determine whether the trial court's error mandates reversal. Not every error affecting the selection or removal of jurors requires reversal. *See Castle*, 128 N.H. at 653, 517 A.2d at 850; *Bailey*, 127 N.H. at 421, 503 A.2d at 767. The error will be found harmless if it appears beyond a reasonable doubt that the error did not affect the verdict. *Bailey*, 127 N.H. at 421, 503 A.2d at 767; *State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976).

 In this case, we conclude that the trial court's error did not affect the jury's verdict. A trial court's efforts to mitigate the effects of an error in the jury selection or removal process may render that error harmless. *See Castle*, 128 N.H. at 653, 517 A.2d at 850. Here, the trial court directed the juror not to discuss the *voir dire* with the other members of the jury; "[o]ur system of justice is premised upon the belief that jurors will follow the court's instructions." *State v. Novosel*, 120 N.H. 176, 186, 412 A.2d 739, 746 (1980). In addition, rather than permit the juror to remain on the jury throughout the deliberation process, the trial court designated him as an alternate. An alternate was not required, and the juror was discharged when the remaining jurors were dispatched to begin deliberations. Moreover, the *voir dire* and disqualification of the juror occurred immediately prior to closing arguments, and the jury began deliberations two hours later. Thus, prior to his discharge, the juror had only minimal contact with the other jurors. Finally, we find significant the fact that this juror was excused due to concern that he held a bias against the prosecution and not against the defendant, who actually had argued against his dismissal. As such, this is a wholly different case from one in which a juror who was potentially prejudiced against the defendant was allowed to remain seated.

We find that the trial court's failure to dismiss the juror immediately, while error, does not require reversal.

*Affirmed.*

All concurred.